[No. E046687. Fourth Dist., Div. Two. Oct. 30, 2009.]

CALIFORNIA UNIONS FOR RELIABLE ENERGY et al., Plaintiffs and Appellants, v.
MOJAVE DESERT AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of footnote 3.

1226

1228

## COUNSEL

Adams Broadwell Joseph & Cardozo, Marc D. Joseph and Gloria D. Smith for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriguez, Chief Assistant Attorney General, Ken Alex, Assistant Attorney General, Sally Magnani and Susan L. Durbin, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Best Best & Krieger, Michelle Ouellette, Brian D. Mabee; and Karen K. Nowak, District Counsel, for Defendants and Respondents.

## OPINION

**RICHLI, Acting P. J.**—In 2007, the Mojave Desert Air Quality Management District (the District) adopted "Rule 1406."[1] Rule 1406 concerns the use of road paving—which reduces airborne dust—to offset increases in airborne dust as well as other forms of particulate air pollution.

The parties offer strikingly different characterizations of Rule 1406.

According to the District, Rule 1406 merely provides a "protocol" to be used in applying for, calculating, and issuing paving offsets. It does not authorize any actual road paving; hence, it cannot possibly have any environmental effects. Any future paving offsets will be subject to environmental review if and when applicants seek them, but at this point, their environmental effects are speculative.

Based on this characterization, the District found that its adoption of Rule 1406 was exempt from environmental review under the California

---

[1] Rule 1406 was amended in October 2008, after this appeal was already pending. The amendments do not appear to have any relevant substantive effect. Nevertheless, our opinion deals exclusively with Rule 1406 as it stood before the amendments.

Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) under the "Class 8" categorical exemption, which applies to "actions taken by regulatory agencies . . . to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment." (Cal. Code Regs., tit. 14, § 15308.)

By contrast, according to plaintiffs,[2] Rule 1406 "would allow the paving of up to 5,000 miles of dirt roads," and thus it would have adverse environmental effects. Moreover, the fine particulate matter produced by combustion is a worse pollutant than the coarse particulate matter produced by unpaved roads, so that using the latter to offset the former would, in itself, have adverse environmental effects. Plaintiffs conclude that Rule 1406 does not qualify for the claimed exemption.

CEQA does not demand the impossible; it simply requires public agencies to consider the reasonably foreseeable environmental effects of their actions. Plaintiffs may have overstated their case a bit by harping on the unlikely possibility that Rule 1406 may result in the paving of all 5,000 miles of unpaved road within the District's jurisdiction. Still, it is reasonably foreseeable—indeed, it is almost undeniable—that the adoption of Rule 1406 will result in *some* road paving. Plaintiffs showed that road paving would tend to have adverse environmental effects; the District, for its part, failed to show that these effects would be either de minimis or too speculative to analyze. Accordingly, there was insufficient evidence to support the District's finding that the adoption of Rule 1406 would "*assure* the maintenance, restoration, enhancement, or protection of the environment . . . ." (Cal. Code Regs., tit. 14, § 15308, italics added.)

I

FACTUAL BACKGROUND

A. *General Legal Background.*

Particulate matter (PM) refers to very small solid or liquid particles that can be suspended in the atmosphere. Particulate matter consisting of particles that are 10 micrometers or less in diameter (PM10) is considered an air

---

[2] The plaintiffs are (1) California Unions for Reliable Energy, "a coalition of unions whose members construct and maintain industrial projects throughout California"; (2) the Center for Biological Diversity, "a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and law"; and (3) Frank Leivas, a concerned resident of the District.

pollutant. (40 C.F.R. § 50.6(c) (2009).) PM10 can be further subclassified into fine particles, which are 2.5 micrometers or less in diameter (PM2.5) (40 C.F.R. § 50, appen. L (2009)) and coarse particles, which are between 10 and 2.5 micrometers in diameter (PM10-2.5) (40 C.F.R. § 50, appen. *O* (2009)).

The federal Clean Air Act (42 U.S.C. § 7401 et seq.) requires the Environmental Protection Agency (EPA) to prescribe national ambient air quality standards (Standards). (42 U.S.C. § 7409(a), (b).) These include separate Standards for PM10 (40 C.F.R. § 50.6(a) (2009)) and PM2.5 (40 C.F.R. § 50.7 (2009)). Areas that fail to meet the Standards are designated as "nonattainment" areas. (42 U.S.C. § 7407(d).)

Each state is required to adopt a state implementation plan (Plan) that "provides for implementation, maintenance, and enforcement" of the Standards. (42 U.S.C. § 7410(a); see also *id.*, § 7407(a).) A Plan must include a permit program for major new or modified stationary sources of air pollution in nonattainment areas (new source review). (42 U.S.C. §§ 7410(a)(2)(C), 7502(c)(5), 7503.) A permit for a new source may be granted only if it obtains emission reduction credits to offset the increased emissions that it will produce. (42 U.S.C. § 7503(a)(1)(A), (c).)

The District "is the local agency with the primary responsibility for the development, implementation, monitoring, and enforcement of air pollution control strategies" for most of the Mojave Desert Air Basin. (Health & Saf. Code, § 41211; see also Health & Saf. Code, §§ 41200–41267; Cal. Code Regs., tit. 17, § 60109 [defining the Mojave Desert Air Basin].) The Legislature intended the District "[t]o successfully develop and implement a comprehensive program for the attainment and maintenance of state and federal ambient air quality standards . . . ." (Health & Saf. Code, § 41200, subd. (d).) To that end, the District has the power to make rules that become part of the state Plan. (Health & Saf. Code, § 41230; see generally *id.*, § 41200 et seq.)

Parts of the District have been designated as nonattainment areas for PM10. (40 C.F.R. § 81.305 (2009); 67 Fed.Reg. 50805, 59005 (Aug. 6, 2002); Cal. Code Regs., tit. 17, § 60205.) However, the District does not include any nonattainment areas for PM2.5. (40 C.F.R. § 81.305 (2009); Cal. Code Regs., tit. 17, § 60210.)

The following additional facts are taken from the administrative record.[3]

### B. *Rule 1406.*

"Traditional" offset methods include shutting down an existing facility or controlling the emissions from it. The District has identified road paving as an acceptable—albeit " 'non-traditional' "—method of offsetting PM10 emissions. The District's jurisdiction includes approximately 5,000 miles of unpaved roads.

Rule 1406 was derived from a similar rule adopted in Maricopa County, Arizona. Its purpose is to ensure that PM10 offsets for road paving meet federal requirements that all offsets must be "[r]eal," "[q]uantifiable," "[p]ermanent," "[e]nforceable" and "[s]urplus." (See 42 U.S.C. § 7503(a); 40 C.F.R. § 51, appen. S, § IV.C.3.(i)(1) (2009).)[4]

Rule 1406 is too long to quote here in its entirety. Accordingly, we summarize its principal provisions.

It states that paving offsets "may be used as offsets in accordance with" other District rules governing new source review. It provides two mathematical formulas for determining the PM10 emissions from paved and unpaved roads, respectively, in units of pounds per vehicle mile traveled. It then provides that "[t]he [PM10] emission reductions associated with paving an unpaved [road] shall be calculated as the difference . . . between the emissions from the road in the unpaved condition and the emissions from the road in the paved condition." The resulting reduction in PM10 emissions can be used to offset an increase in PM10 emissions on a one-to-one basis. (See also Mojave Desert Air Quality Management District Rule 1305(C), available at <http://www.mdaqmd.ca.gov/Modules/ShowDocument.aspx?documentid=218> [as of Oct. 30, 2009].)

Former Rule 1406 also prescribed procedures for approving or denying an application for paving offsets. It stated, "The [District] shall determine whether to issue or deny [paving offsets] in compliance with the standards set forth in subsection (C)(5) . . . ." Subsection (C)(5) then states:

---

3 \*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante*, page 1225.

[4] In connection with a previous project within the District (Blythe Energy Project II), the EPA had taken the position that a Plan that provides for "non-traditional [offsets], such as road paving, . . . must contain an approved protocol for quantifying and guaranteeing the permanence, surplus nature and enforceability of such credits."

"(a) The [District] shall only issue [paving offsets] pursuant to this Rule, if the emission reductions will be Real, Quantifiable, Permanent, Enforceable and Surplus.

"(b) The [District] shall only issue [paving offsets] pursuant to this rule . . . in the amount determined necessary for construction of the new or modified facility or emissions unit . . . ."

Finally, Rule 1406 provided: "After the [District] has determined to issue the [paving offsets] the [District] shall submit the proposed [paving offsets] for public notice and comment . . . ." "Upon the expiration of the public comment period; after review of comments accepted, if any; and upon payment of the appropriate analysis fee, if any; the [District] shall issue the [paving offsets] . . . ."

### C. *The Proposed Class 8 Categorical Exemption Finding.*

A staff report acknowledged that the adoption of Rule 1406 was a " 'project' " within the meaning of CEQA. It stated, however: "The potential environmental impacts of compliance with the adoption of proposed Rule 1406 are positive to the environment, as proposed Rule 1406 will encourage additional road paving with commensurate reduction in particulate emissions from unpaved road dust entrainment."[5] It also stated: "The adoption of proposed Rule 1406 is exempt from CEQA review because it will not create any adverse impacts on the environment. Because there is no[] potential that the adoption might cause the release of additional air contaminants or create any adverse environmental impacts, a Class 8 categorical exemption (14 Cal. Code Reg[s]. § 15308) applies."

### D. *Plaintiffs' Comments.*

In response to the staff report, plaintiffs submitted 86 pages of comments. Their comments were supported by the in-depth analyses of Dr. Petra Pless and David P. Howekamp, who were duly qualified expert environmental consultants.

Plaintiffs objected that the adoption of Rule 1406 could have a number of potentially significant environmental impacts. In this appeal, they focus on the following three.

---

[5] "Entrainment" is used here in its technical engineering sense, meaning the suspension of small particles in a flowing liquid or gas. (See <http://dictionary.oed.com/cgi/entry/50076303>, definition 2 [as of Oct. 30, 2009].)

1. *The differences between combustion-related PM10 and road dust PM10.*

New stationary sources of PM10, such as power plants, tend to generate PM10 through combustion.[6] Plaintiffs commented that "[c]ombustion-related PM10 is qualitatively different from entrained road dust PM10." PM10 from road dust is mostly coarse, with only about 5 to 10 percent PM2.5. By contrast, PM10 from combustion is mostly fine; it can be 98 to 100 percent PM2.5. "Thus," according to plaintiffs, "the District is effectively trading one air pollution problem for another."

PM2.5 differs from PM10-2.5 in its tendency to spread through the atmosphere. Larger particles fall out of the air faster than smaller particles. Also, PM10-2.5 particles from road dust are kicked up by vehicles at ground level, whereas PM2.5 particles from combustion "typically exit through tall stacks with high exit velocities . . . ." Thus, PM10 from road dust travels only a short distance and settles not far from the road, whereas PM2.5 from combustion is "regionally distributed."

PM2.5 also differs from PM10-2.5 in its tendency to cause disease. "Fine particle pollution" is "link[ed] . . . with serious morbidity and mortality." Exposure to fine PM has been shown to be associated with both lung cancer and heart disease.

In addition, plaintiffs noted that the very activity of paving roads would in itself cause PM2.5 emissions, including diesel exhaust, a "[p]articularly damaging" source of fine PM, "contain[ing] nearly 40 toxic substances."

Plaintiffs quoted a letter from the State Air Resources Board (the Board) stating: " 'Fine particulate matter emissions are a serious human health concern.' " The Board explained: " '[F]ine particulates . . . (PM2.5) have unique pulmonary dynamics. They selectively penetrate into lung alveoli. Whatever chemicals the particulates have absorbed . . . are also transported into the body.' " The Board concluded: " 'We believe there is no technical justification for allowing PM emission reductions from road paving to offset PM10 increases from natural gas combustion. . . . If [offsets] have been granted for paving roads, those [offsets] should not be allowed to be used to mitigate the impacts of combustion particulate . . . .' " (Boldface omitted.)

---

[6] The District claims that unpaved roads are "a primary component" of PM10 emissions within its jurisdiction. (Underscoring omitted.) In support of this statement, however, it cites a document that was not included in the administrative record. In any event, even assuming this is true, it is significant that any *new* sources requiring offsets are likely to be combustion related.

### 2. *The effects on animals and plants.*

Plaintiffs also commented that: "Paving . . . roads may result in a number of adverse direct and indirect impacts on biological resources. Direct impacts include mortality during road construction and increased frequency of road-kill from vehicle travel on paved roads. . . . [I]ndirect impacts include spread of invasive plant species; air, water, soil, and noise pollution; soil disturbance and erosion; and increase of roadway pollutants and associated habitat loss, degradation and fragmentation; alteration of wildlife movement; and changes in wildlife populations."

Paved roads increase roadkill because they attract more vehicles, and they allow vehicles to travel at higher speeds. In addition, they absorb heat during the day and release it at night, thus attracting animals in search of warmth.

The act of road paving would kill "[a]ny vegetation along the unimproved road, . . . any species living in that vegetation or on the unimproved road shoulders," and "any sessile or slow-moving organisms in the path of the road."

Animal species that live along unpaved roads in the District, and that therefore could be directly adversely affected by road paving, include the desert tortoise, a state and federal threatened species; the Mojave ground squirrel, a state threatened species; and the Western burrowing owl, a state and federal species of concern.

### 3. *Growth-inducing effects.*

Finally, plaintiffs commented that road paving could induce growth: "Paving roads may . . . encourage land development by improving access to properties that are at present only accessible via unpaved roads. Consequently, newly paved roads would facilitate the already rampant urban sprawl . . . ."

### E. *The District's Response.*

The District provided responses to plaintiffs' comments. In these, it stated: "There will be no increase in any particulate emissions due to the proposed rule." It also stated, "It is the District's reasonable judgment that detailed environmental review of potential, speculative impacts from paving of particular roads which might occur at some point in the future is unable to be performed due to the highly speculative and unknown nature of any potential paving projects which could be used to generate [offsets] pursuant to this

Rule. . . . When and if any application for [offsets] is submitted the environmental impacts of such should be assessed by the agency accepting the paving of the road."

The District then adopted Rule 1406 and found that the Class 8 categorical exemption applied.

## II

## PROCEDURAL BACKGROUND

Plaintiffs filed a timely petition for a writ of administrative mandate pursuant to CEQA.[7]

After hearing argument, the trial court denied the petition. It ruled: "[S]ubstantial evidence . . . supports the [D]istrict's determination that the Class 8 categorical exemption applies. Rule 1406 is [a] component of new source review of any new or modified stationary sources of air pollutants and is intended to assist the [D]istrict in bringing the non-attainment area into attainment with national air pollution standards. As such, it will enhance or protect the environment. It does not relax standards or allow environmental degradation. Indeed, it does not permit any activity that would harm or degrade the environment. Contrary to petitioners' argument, the rule does not permit the paving of any road or the using of any offset . . . : the rule simply sets forth a protocol for calculating such an offset if one is sought. Whether the use of such offsets in connection with a particular project is appropriate will be part of the environmental analysis of that project. Nothing in the rule entitles a future applicant to use such offsets." Accordingly, it entered judgment against plaintiffs and in favor of the District.

## III

## DISCUSSION

A. *General CEQA Principles.*

1. *Overview of the CEQA process.*

█ "CEQA and its implementing administrative regulations (CEQA Guidelines) establish a three-tier process to ensure that public agencies

---

[7] Plaintiffs named as defendants not only the District, but also Eldon Heaston, in his capacity as the District's air pollution control officer. (See Health & Saf. Code, § 40750.) Inasmuch as his interests are wholly aligned with the District's, we will disregard the distinction between them.

inform their decisions with environmental considerations. [Citation.] The first tier is jurisdictional, requiring that an agency conduct a preliminary review to determine whether an activity is subject to CEQA. [Citations.] An activity that is not a 'project' . . . is not subject to CEQA. [Citation.]

"The second tier concerns exemptions from CEQA review. The Legislature has provided that certain projects, such as ministerial projects and repairs to public service facilities of an emergency nature, are exempt. [Citations.] In addition, . . . the CEQA Guidelines list categorical exemptions or 'classes of projects' that the resources agency has determined to be exempt per se because they do not have a significant effect on the environment. [Citations.] [¶] . . . [¶]

"If a public agency properly finds that a project is exempt from CEQA, no further environmental review is necessary. [Citation.] The agency need only prepare and file a notice of exemption [citations], citing the relevant statute or section of the CEQA Guidelines and including a brief statement of reasons to support the finding of exemption [citation]. If a project does not fall within an exemption, the agency must 'conduct an initial study to determine if the project may have a significant effect on the environment.' [Citation.] . . .

"CEQA's third tier applies if the agency determines substantial evidence exists that an aspect of the project may cause a significant effect on the environment. In that event, the agency must ensure that a full environmental impact report is prepared on the proposed project. [Citations.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379–381 [60 Cal.Rptr.3d 247, 160 P.3d 116], fn. omitted.)

### 2. *First tier: The existence of a "project."*

■ "Project" is defined as an "activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Pub. Resources Code, § 21065; see also Cal. Code Regs., tit. 14, § 15378.) "Activity," for this purpose, includes "[a]n activity directly undertaken by any public agency" (Pub. Resources Code, § 21065, subd. (a)), as well as "[a]n activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies" (Pub. Resources Code, § 21065, subd. (c)).

"Under CEQA, 'project' 'refers to the *underlying activity* which may be subject to approval by one or more governmental agencies; it does not refer to each of the several approvals sequentially issued by different agencies.' [Citations.] 'This definition ensures that the action reviewed under CEQA is

not the approval itself but the development or other activities that will result from the approval.' [Citation.]" (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 106 [56 Cal.Rptr.3d 728].)

" 'Whether a particular activity constitutes a project in the first instance is a question of law.' [Citation.]" (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1203 [88 Cal.Rptr.3d 625].)

### 3. *Second tier: The existence of an exemption.*

"The CEQA Guidelines provide for 33 classes of projects that generally do not have a significant effect on the environment and therefore may be exempted from CEQA review. [Citations.]" (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1186 [74 Cal.Rptr.3d 665], fn. omitted.)

In this case, the District relies on the so-called "Class 8" categorical exemption, which applies to "actions taken by regulatory agencies, as authorized by state or local ordinance, to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption." (Cal. Code Regs., tit. 14, § 15308.)

"The scope of an exemption may be analyzed as a question of statutory interpretation and thus subject to independent review. [Citations.] But 'the substantial evidence test governs our review of the [agency's] factual determination that a project falls within a categorical exemption.' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1382 [44 Cal.Rptr.3d 128].)

"Applying the substantial evidence test in the context of a court reviewing an agency's [exemption] decision . . . means determining whether the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. Although the agency bears the burden to demonstrate with substantial evidence that its action fell within the exemption, all conflicts in the evidence are resolved in its favor and all legitimate and reasonable inferences are indulged in to uphold findings, if possible. [Citations.]" (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 968 [88 Cal.Rptr.3d 506].)

"In determining . . . whether the agency's findings are supported by substantial evidence, the trial court and the appellate courts essentially

perform identical roles. We review the record de novo and are not bound by the trial court's conclusions. [Citations.]" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479 [80 Cal.Rptr.3d 28, 187 P.3d 888].)

### B. *CEQA Principles as Applied to This Case.*

■ The adoption of a rule or regulation can be a project subject to CEQA. (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 206 [132 Cal.Rptr. 377, 553 P.2d 537]; *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412 [22 Cal.Rptr.3d 393].)

"Many agencies take the position that rulemaking actions are [exempt under] CEQA, relying either on the exemption from CEQA that applies when it is certain an activity will not have a significant environmental impact [citation], or the categorical exemptions for actions taken to protect natural resources [citation] or to protect the environment [citation]." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2009) § 20.43, p. 981.)

"Rulemaking proceedings cannot be found exempt, however, when the rule has the effect of weakening environmental standards. [Citations.] [¶] [Even a] new regulation that strengthens some environmental requirements may not be entitled to an exemption if the new requirements could result in other potentially significant effects. [Citations.]" (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 20.43, p. 981.)

For example, in *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644 [11 Cal.Rptr.2d 850], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, footnote 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268], an air quality management district adopted regulations that required new control measures for the emission of volatile organic compounds (VOC) from paint and other "architectural coatings." (*Dunn-Edwards*, at pp. 649–650.) The plaintiffs presented "evidence that the new regulations require[d] lower quality products. As a result, more product w[ould] be used, which w[ould] lead to a net increase in VOC emissions." (*Id.* at p. 658.) The district took the position that its adoption of the regulations was categorically exempt, citing, among other things, the Class 8 exemption. (*Id.* at p. 653.) It argued that the regulations "constitute[d] more stringent standards for VOC and [thus] cannot be said to have created an adverse change." (*Id.* at p. 657.)

The appellate court rejected the district's exemption claim: "The only evidence in rebuttal to that presented by plaintiffs is an [air resources board]

staff response" concluding: " '[T]he staff disagrees with the assertion that implementation of the [suggested control measures] will result in an emissions increase due to increased thinning, more frequent recoating and increased incidence of job failures. Thus, the staff disagrees with the contention . . . that implementation will have adverse environmental impacts.' This conclusion is based on the fact there was no supporting data for plaintiffs' claims. Thus, rejection of plaintiffs' claims is predicated on lack of the very information which would be provided by an EIR. Since the staff likewise was unable to produce evidence of no adverse impact, the District cannot say with certainty 'there is no possibility that the activity in question may have a significant effect on the environment.' [Citation.]" (*Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist., supra*, 9 Cal.App.4th at p. 658.)

■ Ordinarily, as noted earlier, we review a categorical exemption finding under the substantial evidence standard. (*Great Oaks Water Co. v. Santa Clara Valley Water Dist., supra*, 170 Cal.App.4th at p. 968.) The District's exemption claim, however, was based not so much on evidence as on logic. If that logic is flawed, or if it is contrary to the evidence, the claim must fail.

The District reasoned, in part, that "Rule 1406 [is] positive to the environment, as [it] will encourage additional road paving with commensurate reduction in particulate emissions from unpaved road dust entrainment." This overlooks the fact that Rule 1406 merely provides for road paving as an *offset* for *new, increased* PM10 emissions. Moreover, it does so in a one-to-one ratio. Thus, even assuming that (1) road dust is environmentally indistinguishable from other PM10 and (2) road paving itself has no deleterious environmental effects, the net effect is, at best, a push. And if either of these assumptions is false, the net effect would be negative.

The District also reasoned that Rule 1406 permits applicants to seek offsets for road paving, but does not require them to do so; if and when an applicant seeks such offsets, the application will be subject to further environmental review. In response to plaintiffs' comments, it added that environmental review at this point would be unduly "speculative."

This argument flows from the District's narrow view of the relevant project as strictly limited to the adoption of Rule 1406. As already noted, however, " '[t]he term "project," . . . means the *whole of an action* which has a potential for physical impact on the environment, and . . . "[t]he term *'project' refers to the underlying activity and not the governmental approval process.*" [Citation.]' [Citation.]" (*Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1171–1172 [227 Cal.Rptr. 688].) Here, the underlying activity was road paving (when performed by applicants for the purpose of obtaining the District's approval of PM10 offsets in the process of new

source review). The approval of Rule 1406 was the first step in a process of obtaining governmental approval for such road paving.

■ "Under CEQA's definition of a project, although a project may go through several approval stages, the environmental review accompanying the first discretionary approval must evaluate the impacts of the ultimate development authorized by that approval. This prevents agencies from chopping a large project into little ones, each with a minimal impact on the environment, to avoid full environmental disclosure. [Citations.] . . . It is irrelevant that the development may not receive all necessary entitlements or may not be built. Piecemeal environmental review that ignores the environmental impacts of the end result is not permitted. [Citations.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 6.31, pp. 329–330.)

"The scope of review under CEQA is not confined to immediate effects but extends to reasonably foreseeable indirect physical changes to the environment. [Citations.] An agency action is not exempt from CEQA simply because it will not have an immediate or direct effect on the environment. CEQA applies if it is reasonably foreseeable that environmental impacts will ultimately result. [Citations.]" (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 4.20, p. 170.)

In the classic case of *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017], the Supreme Court defined the issue before it as "whether [CEQA] applies to the approval of annexation proposals by a Local Agency Formation Commission (LAFCO), where property development is intended to follow the annexation approval and annexation." (*Id.* at p. 268.)

The City of Camarillo and a private landowner had petitioned Local Agency Formation Commission to allow Camarillo to annex 677 acres of the landowner's land. (*Bozung v. Local Agency Formation Com., supra*, 13 Cal.3d at p. 269.) The Supreme Court observed, "Vital to our disposition of this case is that [the landowner's] application stated that the land was presently used for agriculture and would be used 'for residential, commercial and recreational uses,' and that such development was 'anticipated . . . in the near future.' " (*Id.* at pp. 269–270, fn. omitted.)

First, the court held that approval of the annexation was a "project" for purposes of CEQA. (*Bozung v. Local Agency Formation Com., supra*, 13 Cal.3d at pp. 277–278.) It disagreed with the argument "that such an approval is merely permissive and does not compel the city to annex." (*Id.* at p. 278.) "[I]t . . . is an activity directly undertaken by a public agency." (*Ibid.*) Also, "it involves the issuance . . . of an entitlement for use. That, in theory, the city

eventually may not use the entitlement by not annexing, does not retroactively turn a project into a nonproject." (*Id.* at pp. 278–279, fn. omitted.)

The court also held that an EIR (environmental impact report) was required because the ." 'project' was one 'which may have a significant effect on the environment.' [Citation.]" (*Bozung v. Local Agency Formation Com., supra,* 13 Cal.3d at p. 279.) It rejected "[t]he notion that the project itself must directly have such an effect." (*Ibid.*) "[T]he impetus for the . . . annexation is [the landowner]'s desire to subdivide 677 acres of agricultural land, a project apparently destined to go nowhere in the near future as long as the ranch remains under county jurisdiction. The . . . application to LAFCO shows that this agricultural land is proposed to be used for 'residential, commercial and recreational' purposes. Planning was completed, preliminary conferences with city agencies had progressed 'sufficiently' and development in the near future was anticipated. In answer to the question whether the proposed annexation would result in urban growth, the city answered: 'Urban growth will take place in designated areas and only within the annexation.' [¶] It therefore seems idle to argue that the particular project here involved may not culminate in physical change to the environment." (*Id.* at p. 281, fns. omitted.)[8]

More recently, in *Plastic Pipe & Fittings Assn. v. California Building Standards Com., supra,* 124 Cal.App.4th 1390, the California Building Standards Commission (the Commission) determined that the adoption of regulations allowing the use of cross-linked polyethylene (PEX) pipes required environmental review under CEQA. (*Plastic Pipe,* at p. 1401.) The Plastic Pipe and Fittings Association (PPFA) challenged this position, but the appellate court agreed with the Commission. (*Id.* at pp. 1412–1414.) It stated: "PPFA contends the enactment of regulations allowing the use of PEX is not a project because the causal link between the enactment of regulations and a physical change in the environment is too remote. PPFA argues that PEX is only one of several materials available for plumbing uses and that at this time there is no certainty that PEX will be used in any particular work of construction. A project, however, includes an activity that 'may cause . . . a

---

[8] When *Bozung* was decided, "project" was defined solely in terms of whether the activity at issue was being undertaken, supported, or permitted by a public agency. (*Bozung v. Local Agency Formation Com., supra,* 13 Cal.3d at p. 277, quoting Pub. Resources Code, former § 21065; Stats. 1972, ch. 1154, § 1, p. 2271.) In 1994, this definition was amended so that it now also requires that the activity "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Pub. Resources Code, § 21065; Stats. 1994, ch. 1230, § 4, p. 7682.)

Nevertheless, *Bozung* held that the annexation, although permissive, was a "project" under the then applicable definition, which is now just the first prong of the definition. It also held that the annexation could have a significant effect on the environment, which means that it would meet what is now the second prong of the definition. Accordingly, *Bozung* remains good law, even under the current definition of a "project."

reasonably foreseeable indirect physical change in the environment.' [Citation.] Thus, an activity need not cause an immediate environmental impact to be considered a project." (*Id.* at p. 1413.)

The District notes that, in *Plastic Pipe*, the Commission had already concluded that the regulations could have a significant environmental impact; thus, it argues, that case merely stands for the proposition that a court must defer to an agency's findings if they are supported by substantial evidence. We disagree. The court held that the adoption of the regulations constituted a project as a matter of law. As it stated in its discussion of this issue, "[w]hether an activity constitutes a project under CEQA is a question of law that can be decided de novo based on the undisputed evidence in the record. [Citation.]" (*Plastic Pipe & Fittings Assn. v. California Building Standards Com., supra,* 124 Cal.App.4th at pp. 1412–1413.) Moreover, in this case, as we mentioned earlier, the District determined that Rule 1406 could not have any adverse environmental impacts as a matter of logic, not evidence. *Plastic Pipe* refutes the District's reasoning.

Of course, the District did acknowledge that its adoption of Rule 1406 was a project. Nevertheless, it then cut short its consideration of the project's environmental effects by concluding that the causal link between the adoption of the rule and a physical change in the environment was too remote. This was inconsistent with the holding in *Plastic Pipe*.

■ *Bozung* requires us to reject the District's argument that Rule 1406 is merely permissive. Under *Bozung*, the focus must be not on the project alone, but rather on the project's reasonably foreseeable direct and indirect physical effects. While the adoption of Rule 1406 did not cause any road paving *by itself*, certainly it *encouraged* third parties to pave roads. It is reasonably foreseeable that, if the District allows applicants to obtain PM10 offsets by paving roads, at least some applicants will do so. Otherwise, why adopt the rule?

The District argues that *Bozung* is not controlling because there the annexation was "driven by a developer's *specific project* and therefore *sufficiently definite* to require an EIR," whereas here, any future road paving is "speculative." (Underscoring omitted, italics added.) As the Supreme Court itself defined the issue, however, what was crucial was merely that further property development was "intended." (*Bozung v. Local Agency Formation Com., supra,* 13 Cal.3d at p. 268.) The fact that, in *Bozung*, the evidence of that intent was strong does not mean that lesser evidence will not suffice.

Here, the District intended at least some actual road paving to occur. Indeed, as the administrative record shows, at the same time as the District

was considering Rule 1406, the City of Victorville was proposing to build a power plant called the Victorville 2 Hybrid Power Project. Victorville proposed to offset the resulting increased PM10 by paving specified roads, totaling 1.37 miles. Indeed, Victorville had been "working closely" with the District in the development of Rule 1406. The District had even drawn up a list of roads within its jurisdiction that were suitable for paving.[9]

The administrative record contains no *evidence* (as opposed to the District's bare assertion) that the environmental effects of the adoption of Rule 1406 are speculative. Plaintiffs' comments were at least some evidence that the *quality* of those effects would in fact be adverse. Basically, plaintiffs showed that trading a pound of PM10 from road dust[10] for a pound of PM10 from combustion would mean that the resulting PM10 would stay in the air longer, spread more widely, and be more likely to cause disease. Also, the very act of road paving would produce still more PM10—mostly made up of PM2.5—while also having adverse biological and growth-inducing effects.

The only thing that was even arguably speculative about these effects was their *quantity*. Plaintiffs' evidence did not necessarily require a finding that these adverse environmental effects would be *significant*. For example, there was no evidence of how many third parties were likely to apply to pave how many miles of roads. Likewise, it was unclear how many miles of road paving were likely to kill how many burrowing owls.

Nevertheless, the District purported to find that a Class 8 exemption applied. This necessarily meant that the adoption of Rule 1406 would "*assure* the maintenance, restoration, enhancement, or protection of the environment . . . .*" (Cal. Code Regs., tit. 14, § 15308, italics added.) The District has the burden of proof—there must be substantial evidence to support this categorical exemption finding. In the *absence* of evidence that the negative environmental effects of Rule 1406 would *not* be significant, the exemption finding cannot be sustained.

Here, much as in *Dunn-Edwards*, "rejection of plaintiffs' claims is predicated on lack of the very information which would be provided by an EIR. Since the staff likewise was unable to produce evidence of no adverse impact,

---

[9] The District demurred to the complaint—albeit unsuccessfully—on the ground that Victorville had "relied upon the provisions of then unadopted Rule 1406" and was therefore an indispensable party.

[10] One problem we have with Rule 1406—although plaintiffs did not raise this issue in their comments—is that it calculates the offset by taking the emissions from the (actual present) unpaved road and subtracting the emissions from the (hypothetical future) paved road; all emissions are expressed in pounds per vehicle mile traveled. But this assumes that vehicle miles traveled on a road will remain the same after the road is paved. Surely this is an unrealistic assumption?

the District cannot say with certainty 'there is no possibility that the activity in question may have a significant effect on the environment.' [Citation.]" (*Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist., supra,* 9 Cal.App.4th at p. 658.)

 The District argues that *Dunn-Edwards* is distinguishable because here, if and when individual applicants seek paving offsets, there will be further environmental review. Nothing in *Dunn-Edwards* suggests that the outcome there would have been different if there had been a subsequent opportunity for environmental review. Moreover, nothing in the definition of a Class 8 categorical exemption turns on whether there will be a subsequent opportunity for environmental review.

More broadly, the District argues that environmental review at this point is premature and hence unduly speculative. This argument flies in the face of the District's actual determination that the adoption of Rule 1406 would have beneficial environmental effects, and there was no possibility that it would have adverse environmental effects.

 "Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Cal. Code Regs., tit. 14, § 15004, subd. (b).) "To implement the above principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance. For example, agencies shall not: [¶] . . . [¶] . . . take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project." (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B).) "Where an individual project is a necessary precedent for action on a larger project . . . with significant environmental effect, an EIR must address itself to the scope of the larger project." (Cal. Code Regs., tit. 14, § 15165.)

At a minimum, the District committed itself to allowing paving offsets pursuant to the procedure and the formulas set forth in Rule 1406. Former Rule 1406 stated that: "The [District] shall determine whether to issue or deny [paving offsets] in compliance with [specified] standards . . . ." Admittedly, it makes the issuance of a paving offset subject to a public comment period. Nevertheless, it also provides that "[u]pon the expiration of the public comment period; after review of comments accepted, if any; and upon payment of the appropriate analysis fee, if any; *the [District] shall issue*

*the [paving offsets] . . . ."* (Italics added.) It does not appear that the District could refuse to issue a paving offset on the ground that the formulas in Rule 1406 failed to adequately account for the environmental effects of road paving.

Thus, by adopting Rule 1406, the District lost the opportunity to consider possible alternatives and mitigation measures. Suppose an applicant seeks to build a new power plant, using paving offsets. Further suppose that a challenger argues that there must be environmental review of the proposed offsets, because they tend to increase PM2.5, or because the very activity of road paving would have adverse environmental impacts. The District would be able to respond that this is, in effect, a CEQA challenge to Rule 1406, and that the statute of limitations has run on any such challenge. (See *Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 434–439 [50 Cal.Rptr.2d 769] [where statute of limitations had run on challenge to previous project, review of modified project was limited to its incremental effects] [Fourth App. Dist., Div. Two].)

We therefore conclude that there was insufficient evidence to support the District's finding that the adoption of Rule 1406 was within the Class 8 categorical exemption.

IV

DISPOSITION

The District asked the trial court to deny the petition for one and only one reason—because its categorical exemption finding was appropriate. As we are holding that the categorical exemption finding was *not* appropriate, it appears that plaintiffs are entitled to the writ sought.

Accordingly, the judgment is reversed with directions to the trial court to grant the petition and to issue a writ of mandate commanding the District to set aside (1) its adoption of Rule 1406 and (2) its finding that the adoption of Rule 1406 was within the Class 8 categorical exemption. (See *Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1074 [72 Cal.Rptr.3d 690].) The trial court shall retain jurisdiction over the District's further proceedings by way of a return to the writ. (*Ibid.*; see also Pub. Resources Code, § 21168.9, subd. (b); *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1423 [43 Cal.Rptr.2d 170].) We do not mean to preclude the trial court from including additional terms in its judgment or in its writ of mandate, nor from holding such further hearings as it may deem necessary to

determine what additional terms should be included. Moreover, we do not mean to preclude the District from finding that the adoption of Rule 1406 is within the Class 8 categorical exemption or otherwise exempt, as long as it does so in compliance with CEQA.

Plaintiffs are awarded costs on appeal against the District.

Gaut, J., and Miller, J., concurred.

On November 16, 2009, the opinion was modified to read as printed above.