Filed 1/26/22  Save Our Rural Town v. County of L.A. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAVE OUR RURAL TOWN,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>        Defendants and Respondents. | B309992<br><br>(Los Angeles County<br>Super. Ct. No.20STCP00419) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Jackson Tidus, Alene M. Taber for Plaintiff and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Starr Coleman, Assistant County Counsel, Keever Rhodes Muir, Deputy County Counsel; The Sohagi Law Group, Margaret M. Sohagi, Nicole H. Gordon, and Paige E. Samblanet for Defendants and Respondents.

Save Our Rural Town (SORT) appeals from the trial court judgment denying its writ petition. The trial court found that the OurCounty environmental strategy plan adopted by Los Angeles County was not a project under the California Environmental Quality Act (CEQA) and therefore did not yet require a formal environmental review. We too conclude that OurCounty is merely aspirational and insufficiently concrete to amount to a project under CEQA, and therefore affirm the judgment.

## FACTUAL BACKGROUND

In 2016, the Los Angeles County Board of Supervisors established a Chief Sustainability Office "to create a vision for making our communities healthier, more equitable, economically stronger, more resilient, and more sustainable."[1] The CSO also was "tasked with developing, implementing, and updating a new Countywide Sustainability Plan." Its formal efforts to create such a plan, including stakeholder workshops, presentations to "business, civic, and community organizations across the region," "expos" in each of the county's supervisorial regions, and circulation of a "discussion draft," began in late 2017 and continued through mid-2019.[2]

---

[1] We will refer to respondent County of Los Angeles as "the County," to its Board of Supervisors as "the Board," and to the Chief Sustainability Office as "the CSO."

[2] SORT asserts there was "no real outreach, no workshops, and no community meetings held in most of the County's unincorporated area," despite providing a record citation to a CSO outreach email specifically directed to the Antelope Valley Association of Rural Town Councils (which itself expressed concern over the alleged lack of outreach). The administrative record also indicates that the CSO met with various town

The CSO received more than 6,000 comments during this process, including letters from the Acton Town Council and the Association of Rural Town Councils that questioned its compliance with CEQA. The Board also received a letter from SORT, which describes itself as "a grassroots unincorporated association . . . that works to protect rural communities from significant environmental impacts." SORT urged the Board "to defer approval until a legally sufficient environmental document can be prepared." In a memo transmitting the final draft of OurCounty to the Board, the CSO stated that County Counsel had advised that OurCounty, "as a strategic guidance document, is not a project under CEQA." The transmittal memo also stated, "When implementing an action under the OurCounty Plan, we will return to the Board for review and appropriate CEQA findings, as may be required."

During the August 2019 Board meeting at which the plan was considered, the CSO reiterated that "by design, the plan is more akin to a high level strategic plan." The CSO assured the Board that it "fully expect[ed] and commit[ed] to assessing the actions as they are developed by county departments to determine the potential costs and benefits," and that "all of those items will come back before this board for approval." After hearing these remarks, and those of approximately 70 other commenters, the Board unanimously adopted OurCounty.

councils, including the Acton Town Council, and extended the public comment period for residents and organizations located in the Santa Clarita and Antelope Valleys at the request of Fifth District Supervisor Kathryn Barger, who later thanked the CSO for "reach[ing] out to rural areas in the town councils in my District." Regardless, the extent of the County's outreach efforts is not relevant to the substance of this appeal.

OurCounty contains 12 "broad, aspirational, and cross-cutting goals" that "describe our shared vision for a sustainable Los Angeles County, including "[b]uildings and infrastructure that support human health and resilience," "[t]hriving ecosystems, habitats, and biodiversity," and a "fossil fuel-free LA County."[3] The goals, defined by the plan as "[b]road, aspirational statement[s] of what we want to achieve," are supported by 37 "strategies," defined as "[l]ong-range approach or approaches that we take to achieve a goal," and 159 "actions," defined as "[s]pecific policy, program[s], or tool[s] we use to support a strategy." The plan identifies short-, medium-, and long-term "targets" and "implementation horizons" for strategies and actions, respectively, and also identifies "lead" and "partner" county entities that will "oversee[ ] implementation of the action within their jurisdiction."

---

[3] The other nine goals are "[r]esilient and healthy community environments where residents thrive in place"; "[e]quitable and sustainable land use and development without displacement"; "[a] prosperous LA County that provides opportunities for all residents and businesses and supports the transition to a green economy"; "[a]ccessible parks, beaches, recreational waters, public lands, and public spaces that create opportunities for respite, recreation, ecological discovery, and cultural activities"; "[a] convenient, safe, clean, and affordable transportation system that enhances mobility while reducing car dependency"; "[s]ustainable production and consumption of resources"; "[i]nclusive, transparent, and accountable governance that facilitates participation in sustainability efforts, especially by disempowered communities"; and "[a] commitment to realize OurCounty sustainability goals through creative, equitable, and coordinated funding and partnerships." All 12 goals are equally speculative, for the reasons stated in this opinion.

By way of example, Goal 2, "Buildings and infrastructure that support human health and resilience," is supported by four strategies, one of which is to "integrate climate adaptation and resilience into planning, building, infrastructure, and community development decisions." The short-term targets for this strategy are to "[c]onvert 10% of heat-trapping surfaces to cool or green surfaces" and "[r]educe by 15% the number of heat-stress emergency department visits per 100,000 residents" by 2025. Medium- and long-term targets include achieving more aggressive conversion and reduction by 2035 and 2045. One of the four actions associated with this strategy is to "[d]evelop a comprehensive heat island mitigation strategy and implementation plan that addresses cool pavements and roofs, pavement reduction, and urban greening." The Department of Health is identified as the "lead" county entity on this "short term" action, and four other departments are named as partners. The other goals, strategies, actions, and targets are largely similar in nature and scope.

OurCounty expressly provides that, "[a]s a strategic plan," it "does not supersede land use plans that have been adopted by the Regional Planning Commission and Board of Supervisors, including the County's General Plan and various community, neighborhood, and area plans." The CSO also advised commenters that "the plan will not be legally enforceable," and "was not intended to be a new policy document with enforceability that acted as an ordinance, general plan or have land use and zoning designation/regulation authority." However, when it approved the plan, the Board directed the County's Chief Executive Office to include goals related to implementing the plan in department heads' annual "Management Appraisal

Performance Plan[s]" and work with the CSO to "develop a multi-year funding plan" to implement OurCounty.

## PROCEDURAL HISTORY

SORT filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief in January 2020. It alleged the County violated CEQA by failing to prepare an environmental impact report (EIR) or consider the environmental factors of OurCounty, particularly "the potentially significant environmental impacts on rural communities that were raised by the public in connection to the Plan's renewable energy Goals, Strategies, and Actions."

After receiving written briefing and hearing oral argument, the trial court issued a detailed written ruling denying the petition in December 2020. The trial court found that although "SORT's list of environmental impacts is legitimate, and the listed impacts probably must be considered for any specific project, there is no causal connection between the Sustainability Plan and the environmental harms SORT alleges." It concluded that OurCounty did not mandate, require, or commit the County to any specific action, and therefore was not a CEQA "project" capable of causing either direct or indirect physical change to the environment.

## DISCUSSION

### I.     Standard of Review

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not

6

supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, footnotes omitted.) Our review of the administrative record for legal error and substantial evidence is the same as the trial court's: we review the County's action, not the trial court's decision. (*Id.* at p. 427.) "[I]n that sense appellate judicial review under CEQA is de novo." (*Ibid.*)

## II.     CEQA Framework

CEQA is a comprehensive legislative scheme designed to protect the environment. It requires public agencies charged with regulating activities that affect the environment "to give prime consideration to preventing environmental damage when carrying out their duties." (*Mountain Lion Foundation v. Fish & Game Commission* (1997) 16 Cal.4th 105, 112.) CEQA "is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Ibid.*) Relevant to this interpretation are administrative regulations known as the "CEQA Guidelines," codified in title 14, section 15000 et seq. of the California Code of Regulations. (See Pub. Resources Code, § 21083; CEQA Guidelines, § 15000.)[4]

CEQA and the CEQA Guidelines "establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations." (*Muzzy Ranch Co. v. Solano County Airport Land Use Commission* (2007) 41 Cal.4th 372, 379-380 (*Muzzy Ranch*).) The first tier requires the agency to "determine whether the proposed activity is subject to CEQA at all." (*Union of Medical Marijuana Patients, Inc. v. City of San*

---

[4] All further section references are to the Public Resources Code.

7

*Diego* (2019) 7 Cal.5th 1171, 1185 (*UMMP*).) "In practice, this requires the agency to conduct a preliminary review to determine whether the proposed activity constitutes a 'project' for purposes of CEQA." (*Ibid.*) An activity that is not a "project" as defined in section 21065 and CEQA Guidelines section 15378 is not subject to CEQA. (*Id.* at p. 1186; *Muzzy Ranch, supra*, 41 Cal.4th at p. 380; CEQA Guidelines, § 15060, subd. (c)(3).) Only if an activity is found to be a project does the agency move beyond the first analytical tier to consider whether exemptions apply (second tier) and, if not, undertake an environmental review (third tier). (*UMMP, supra*, 7 Cal.5th at p. 1185.)

The threshold question of whether OurCounty is a "project" as defined by—and is thus subject to—CEQA is the determinative issue in this appeal. It is a legal question that we decide de novo by considering undisputed evidence in the appellate record. (*UMMP, supra*, 7 Cal.5th at p. 1198.)[5]

As relevant here, section 21065, subdivision (a) defines a "project" as an "activity directly undertaken by any public agency" that "may cause either a direct physical change in the

_____

[5] Inaccurately citing *Muzzy Ranch, supra*, 41 Cal.4th at p. 370 for a quotation that appears in *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318, SORT further asserts that we should apply the "fair argument standard" to determine "whether a project may cause significant environmental impacts." The fair argument standard, used to evaluate an agency's decision to issue a negative declaration rather than an EIR, comes into play only after an activity is determined to be a project. (See *Save the Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 675-676.) Accordingly, it is inapplicable here, as is SORT's alternative argument that the standard was satisfied.

environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065, subd. (a).)

The CEQA Guidelines similarly specify that "project" means "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (CEQA Guidelines, § 15378, subd. (a).) "A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project," such as "the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant." (CEQA Guidelines, § 15064, subd. (d)(1).) "An indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project," such as, in the sewage treatment plant example, an increase in air pollution caused by increased population itself attributable to increased sewage treatment capacity. (*Id.* § 15064, subd. (d)(2).) Indirect physical changes are not reasonably foreseeable if they are speculative or unlikely to occur. (*Id.* § 15064, subd. (d)(3).)

The Supreme Court has synthesized these definitional standards into a test: "a proposed activity is a CEQA project if, by its general nature, the activity is capable of causing a direct or reasonably foreseeable indirect physical change in the environment. This determination is made without considering whether, under the specific circumstances in which the proposed activity will be carried out, these potential effects will actually occur. Consistent with this standard, a 'reasonably foreseeable' indirect physical change is one that the activity is capable, at

9

least in theory, of causing.  [Citation.]  Conversely, an indirect effect is not reasonably foreseeable if there is no causal connection between the proposed activity and the suggested environmental change or if the postulated causal mechanism connecting the activity and the effect is so attenuated as to be 'speculative.'"  (*UMMP*, *supra*, 7 Cal.5th at p. 1197.)

The necessary causal connection may be established where the activity is "an essential step leading to ultimate environmental impact," such as the approval of a school district's request to secede from its current district and unify with another. (*Fullerton Joint Union High School v. State Board of Education* (1982) 32 Cal.3d 779, 785, 797 (*Fullerton*).)  Such connection may be lacking, however, "in the absence of any concrete development proposals," where unspecified plans are enabled but not compelled.  (*Friends of the Sierra Railroad v. Tuolumne Park & Recreation District* (2007) 147 Cal.App.4th 643, 658-659 (*Sierra Railroad*).)  The ultimate goal is to ensure that an EIR is prepared early enough so that it can "serve its intended function of informing and guiding decision makers," but is not required "before the project is well enough defined to allow for meaningful environmental evaluation."  (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 130.)

## III.   Analysis

SORT contends the trial court erred by ignoring the *Muzzy Ranch* "categorical" approach and focusing instead on whether OurCounty gave rise to any reasonably foreseeable, non-speculative indirect physical changes to the environment.  SORT also argues that the requisite indirect environmental effects exist, that the County committed to implementing OurCounty, and that the trial court's findings that the County did not qualify

10

for certain CEQA exemptions somehow shows that it did not conduct the required preliminary review before determining that OurCounty was not a CEQA project.

Before examining *Muzzy Ranch*, we first note that the "categorical" approach it announced was later tempered in *UMMP*, which clarified that the categorization of an activity was not enough by itself to determine whether it amounted to a project. Instead, the individual substance of a proposed activity had to be considered as part of the "relatively abstract and preliminary nature" of that determination. (*UMMP, supra,* 7 Cal.5th at pp. 1194, 1197-1198.) We therefore examine *Muzzy Ranch* with that standard in mind.

In *Muzzy Ranch*, the Supreme Court considered whether the Travis Air Force Base Land Use Compatibility Plan (TALUP) adopted by the Solano County Airport Land Use Commission was a CEQA project. (See *Muzzy Ranch, supra,* 41 Cal.4th at p. 378.) The TALUP set forth land use compatibility policies for development near Travis Air Force Base and was intended "'to ensure that future land uses in the surrounding area will be compatible with the realistically foreseeable, ultimate potential aircraft activity at the base.'" (*Id.* at p. 378.) To that end, the TALUP explicitly barred amendment of existing general plans, zoning regulations, and land use designations to allow more housing in the covered area. (*Id.* at pp. 378-379.) The Commission adopted the TALUP without conducting an environmental review because it concluded the TALUP was too speculative and non-binding to be a CEQA project. (*Id.* at pp. 378, 382.)

The Supreme Court disagreed. It explained that whether an activity is a CEQA project "is a categorical question" that

11

turns on whether an activity is "the sort of activity that may cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." (*Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 381-382.) The TALUP was not "categorically outside the concern of CEQA" because "a government agency may reasonably anticipate that its placing a ban on development in one area of a jurisdiction may have the consequence, notwithstanding existing zoning or land use planning, of displacing development to other areas of the jurisdiction." (*Id*. at p. 383.)

As it had in *Fullerton*, *supra*, 32 Cal.3d at pp. 795-796, the court rejected the notion that an activity requiring further governmental decisions cannot be a CEQA project and reiterated that an activity that is "an essential step leading to potential environmental impacts" may be a project. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 383.) The court also rejected the Commission's assertion that the TALUP could not be a project because it was merely advisory. It observed that the TALUP "speaks in mandatory terms," "carries significant, binding regulatory consequences for local government in Solano County," and can "trump the land use planning authority that affected jurisdictions might otherwise exercise through general and specific plans or zoning." (*Id*. at pp. 384-385.)

The crucial distinction between *Muzzy Ranch* and this case is that the TALUP was mandatory and OurCounty plainly is not. Unlike the TALUP, which required affected jurisdictions to comply with its provisions and "trumped" local land use planning authority, OurCounty by its terms is "aspirational" and "does not supersede land use plans." Nor is it akin to a binding, modern "general plan" that governs fundamental land use decisions and

12

is therefore subject to CEQA, as SORT suggests.  (See *City of Santa Ana v. City of Garden Grove* (1979) 100 Cal.App.3d 521, 531-533.)  To the contrary, OurCounty is more analogous to advisory general plans predating 1971 legislative reform of the concept: it is "generally permissive in nature with a 'relatively broad, amorphous scope and content," at bottom "'an idealistic statement of policy which might or might not be carried out.'" (*Id.* at pp. 531-532.)

*Sierra Railroad*, *supra*, 147 Cal.App.4th 643, is instructive. There, the court determined that a transfer of land containing a historic railroad right-of-way was not a CEQA project even though "some development of the property surrounding the historical resource was reasonably foreseeable." (*Sierra Railroad*, *supra*, 147 Cal.App.4th at p. 647.)  The court reasoned that although the land transfer potentially set in motion future environmental effects, "[n]o planning process has taken place and no building is expected to go forward in the near future that could cause an impact on the historical resource." (*Id.* at p. 659.)  Thus, "in the absence of any concrete development proposals," review of conceivable environmental impacts "would have been premature." (*Id.* at p. 647.)

Similarly, in *Bridges v. Mt. San Jacinto Community College District* (2017) 14 Cal.App.5th 104, 123-124, a college's agreement to purchase property from a park district was not a CEQA project because "nothing in the purchase agreement commits the college to a definite course of development and there were no development plans in existence when it signed the agreement."

Here, although it is reasonably foreseeable that the goals, strategies, and actions enumerated in OurCounty may in the long run have *some* impact on the environment, the plan is at this

13

stage merely nascent and its eventual effects highly speculative. For instance, using the action exemplar above, "a comprehensive heat mitigation strategy and implementation plan that addresses cool pavements and roofs, pavement reduction, and urban greening" may take any number of forms and call for numerous activities in different areas of the county, each of which would potentially have a multitude of direct and indirect environmental effects. Without knowing more about the ultimate form heat mitigation and pavement reduction may take, any environmental assessment of this action would be premature. None of the numerous OurCounty strategies and actions SORT highlights is any more definite.

SORT contends OurCounty became sufficiently concrete when the Board mandated the development of a funding plan for, and employment goals related to, OurCounty. We disagree. The "Management Appraisal Performance Plan" goals for department heads to which SORT points as evidence of OurCounty's mandatory nature predate the adoption of OurCounty, and the Board did not specify the types of "goals related to implementing the plan" that would be expected going forward. Likewise, a directive to develop a funding plan, and even the identification of possible funding sources for certain tasks, is insufficient to establish a causal connection between OurCounty and any reasonably foreseeable indirect physical impacts.

We find equally unpersuasive SORT's reliance on *Plastic Pipe & Fittings Association v. California Building Standards Commission* (2004) 124 Cal.App.4th 1390 (*Plastic Pipe*) and *California Unions for Reliable Energy v. Mojave Desert Air Quality Management District* (2009) 178 Cal.App.4th 1225 (*Reliable Energy*).

14

In *Plastic Pipe*, a pipefitters' association challenged a determination by the California Building Standards Commission that regulations concerning certain plastic piping were a "project" that required environmental review. (See *Plastic Pipe, supra,* 124 Cal.App.4th at pp. 1398-1401.) The appellate court rejected the association's argument that there was no causal link between the regulations and a physical change in the environment, concluding it was reasonably foreseeable, albeit uncertain, that the regulated piping would be used in future construction projects. (*Id.* at p. 1413.)

SORT contends *Plastic Pipe* is analogous, because OurCounty commits the county to increasing its usage of renewable energy, one way of doing that is by building large-scale solar energy plants in rural areas of the county, and such plants will undoubtedly result in a cavalcade of physical changes to the environment. This comparison is inapt. Approval of a specific type of pipe renders its imminent future use reasonably foreseeable, but a general goal of increasing the use of renewable power sources does not similarly commit the County to building solar farms, let alone in any specific location.

Similarly, in *Reliable Energy*, an air quality management district adopted a rule concerning road paving, which it acknowledged was a project but contended was exempt from CEQA review because there was no potential that it would create any adverse environmental impacts. (*Reliable Energy, supra,* 178 Cal.App.4th at p. 1234.) The court held there was insufficient evidence to support this finding (see *id.* at p. 1247); as more relevant here, it observed that the rule was likely to increase road paving such that indirect environmental effects were reasonably foreseeable. (See *id.* at p. 1244.) As the court noted,

15

the district "intended at least some actual road paving to occur." (*Ibid*.)  Here, it is unclear what the County intends to occur, beyond a general shift toward more sustainability.  Nothing in the plan encourages or incentivizes any specific activity, and it therefore lacks the causal connection to environmental change present in *Plastic Pipe* and *Reliable Energy*.

SORT also emphasizes that our Supreme Court has held that agencies "'cannot argue' that approval of a regulation is not a project 'merely because further decisions must be made' before the activities directly causing environmental change will occur." (*UMMP*, *supra*, 7 Cal.5th at p. 1200.)

We agree that the need for future decisions to be made "before a land use measure's actual environmental impacts can be determined with precision does not *necessarily* prevent the measure from qualifying as a project." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 383, emphasis added.)  It may in some instances, however, where the "postulated causal mechanism connecting the activity and the effect is so attenuated as to be 'speculative.'" (*UMMP*, *supra*, 7 Cal.5th at p. 1197.)

That is the case here, where nothing but speculation connects the high-level strategies and aspirational actions in OurCounty and SORT's assertions that solar power plants will be sited in rural areas, causing wildfires; that preserving and enhancing open space necessarily "will reduce the total developed area in County by 229 square miles"; or that planting more trees (of unspecified types and in unspecified locations) will result in "more emissions of biogenic volatile compounds affecting ozone formation."  The County's commitment to moving ahead with this

aspirational plan does not somehow make it tangible enough to constitute a project.[6]

Finally, we turn briefly to the exemption issue raised by SORT. The trial court rejected the County's argument that the OurCounty plan qualified for certain exemptions from the CEQA environmental review process. The trial court found that the County had not relied on one exemption when adopting OurCounty and had not raised it as an affirmative defense. As to the other, the trial court found that although the County raised the issue in its answer, it had not considered any environmental factors, as required by the CEQA guidelines.[7]

Determining whether any exemptions apply that would eliminate the need for a formal environmental review is part of CEQA's second-tier analysis and comes into play only *after* a proposed activity is found to be a project. (*UMMP, supra,* 7 Cal.5th at p. 1185.) As a result, the exemption issue, and the trial court's findings, are irrelevant to the issue here: whether under the first tier of a CEQA analysis a proposed activity constitutes a project.[8] For all of the reasons above, OurCounty is

[6] Of course, once the County formulates activities pursuant to the OurCounty plan that amount to projects under CEQA, those projects will require environmental review unless any exemptions apply.

[7] The first was the so-called "common sense exemption," which applies when a project can have no potential environmental effects. (CEQA Guidelines, § 15061(b)(3).) The second applies to projects that involve only planning or feasibility studies. (CEQA Guidelines, § 15262.)

[8] As for the County's supposed failure to conduct a preliminary review before determining that OurCounty was not a project (CEQA Guidelines, § 15378), we note the following: First,

17

not a project.  The County accordingly did not prejudicially abuse its discretion by reaching that conclusion, and the trial court properly denied the writ of mandamus.

## DISPOSITION

The judgment of the trial court is affirmed.  Respondent County of Los Angeles is awarded its costs of appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MICON, J.<sup>*</sup>

WILLHITE, ACTING P.J.

CURREY, J.

neither CEQA nor the CEQA Guidelines specify the nature of such a preliminary review, which is preliminary in nature, relatively abstract, and occurs before any formal inquiry into actual environmental impacts.  (*UMMP, supra,* 7 Cal.5th at pp. 1194, 1197-1198.)  Second, the record shows that County Counsel determined that OurCounty was not a project under CEQA, supporting a conclusion that the requisite review occurred.  Third, even if that review did not occur, nothing in CEQA or the CEQA Guidelines provides a penalty for such a failure, and we do not believe any remedy exists where we have determined as a matter of law that OurCounty is not a project.

[*]Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.