Filed 8/13/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| **CALIFORNIA BUILDING INDUSTRY ASSOCIATION,** Plaintiff and Respondent, v. **BAY AREA AIR QUALITY MANAGEMENT DISTRICT,** Defendant and Appellant. | **A135335 & A136212** (Alameda County Super. Ct. No. RG10548693) |


The California Environmental Quality Act (CEQA; Pub. Res. Code, § 21000 et seq.) requires public agencies to conduct an appropriate environmental review of discretionary projects they carry out or approve and to prepare an environmental impact report (EIR) for any project that may have a significant effect on the environment. (Pub. Res. Code, §§ 21151, 21100, 21080, 21082.2.) The CEQA Guidelines[1] encourage public agencies to develop and publish "thresholds of significance" to assist in determining whether a project's effect will be deemed significant. (CEQA Guidelines, § 15064.7.)

Here we consider whether the promulgation of thresholds of significance by a public agency is itself a "project" subject to CEQA review. We conclude it is not and

---

[1] References to the CEQA Guidelines are to the regulations for the implementation of CEQA codified in Title 15, section 15000 et seq. of the California Code of Regulations, which have been developed by the Office of Planning and Research and adopted by the Secretary of the Resources Agency. (Pub. Res. Code, § 21083.) " 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128, fn. 7.)

reverse a superior court judgment that issued a writ of mandate invalidating thresholds of significance promulgated by defendant and appellant the Bay Area Air Quality Management District (the District). We also conclude the court's order cannot be upheld on alternative grounds and reverse an award of attorney fees made to respondent the California Building Industry Association (CBIA) under Code of Civil Procedure section 1021.5.

## I. BACKGROUND

The District is a local agency charged with limiting nonvehicular air pollution in the San Francisco Bay Area. It is authorized to adopt and enforce rules and regulations regarding the emission of pollutants, and to ensure state and federal ambient air quality standards are met. (Health & Saf. Code, §§ 39002, 40000, 40001, subd. (a), 40200.) Among its other activities, the District monitors air quality, engages in public outreach campaigns, issues permits to certain emitters of air pollution and promulgates rules to control emissions. (Health & Saf. Code, §§ 42300, 42301.5, 42315.)

CEQA requires public agencies such as the District to analyze, disclose, and mitigate significant environmental effects of projects they carry out or approve. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 379-381 (*Muzzy Ranch*).) When adopting rules or issuing permits, the District will act as the lead agency for CEQA purposes. The District does not act as a lead agency for CEQA review of residential and commercial development projects in the area, though it may act as a responsible or commenting agency on projects being analyzed by other agencies.[2]

The CEQA Guidelines encourage agencies to publish the "thresholds of significance" used to determine the significance of a project's impact on the environment.

___

[2] The "lead agency" under CEQA is the agency "with principal responsibility for carrying out or approving a project. . . ." (Pub. Res. Code, § 21067.) A "responsible agency" is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Res. Code, § 21069.) Public agencies may also submit comments regarding projects within the agency's expertise, whether or not the project is within the agency's jurisdiction. (Pub. Res. Code, § 21153, subd. (c); CEQA Guidelines, § 15209; see *Consolidated Irr. Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 204-205.)

(CEQA Guidelines, § 15064.7(a).)  In 1999, the District published thresholds of significance concerning certain air pollutants, along with guidelines concerning their use and CEQA analysis of air quality issues in general.  The District's 1999 thresholds and guidelines were "intended to serve as a guide for those who prepare or evaluate air quality impact analyses for projects and plans in the San Francisco Bay Area," and set forth the levels at which toxic air contaminants (TACs) and certain types of particulate matter would be deemed environmentally significant.  The thresholds and guidelines did not include significance levels for greenhouse gases (GHGs), which affect the earth's ability to absorb heat into the atmosphere and are now generally recognized as contributing to global climate change.   (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 938 (*Rialto Citizens*).)[3]

In 2006, the California Legislature passed the Global Warming Solutions Act (Assem. Bill No. 32;[4] Health & Saf. Code, 38500 et seq.), which calls for the reduction of GHG emissions to 1990 levels by 2020.  (See *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1490.)  In 2008, the Legislature passed The Sustainable Communities and Climate Protection Act (Sen. Bill No. 375[5]), requiring regional land use and transportation planning to reduce GHGs, and allowing for CEQA exemptions and streamlining for certain transit priority projects.  (See Pub. Res. Code, §§ 21155, 21155.1, 21155.2, 21155.3, 21159.28.)  The CEQA Guidelines have since been amended to include provisions concerning the significance levels of GHGs associated with a project, mitigation of GHG emissions, and guidance about tiering or streamlining the analysis of GHG emissions.  (CEQA Guidelines, §§ 15064.4, 15126.4(c), 15183.5.)

---

[3] CEQA Guidelines section 15364.5 was added effective March 18, 2010, to provide, " 'Greenhouse gas' or 'greenhouse gases' includes but is not limited to: carbon dioxide, methane, nitrous oxide, hyrofluorocarbons, perfluorcarbons and sulfur hexafluoride."

[4] Assembly Bill No. 32 (A.B. 32) was enacted by Stats. 2006, ch. 488, § 1.

[5] Senate Bill No. 375 (S.B. 375) was enacted by Stats. 2008, ch. 728, § 14.

In 2009, the District drafted new proposed thresholds of significance, citing (1) more stringent state and federal air quality standards, including the addition of $PM_{2.5}$ (particulate matter with a diameter of 2.5 microns or less); (2) the discovery that TACs present an even greater health risk than previously thought; and (3) the growing concern with global climate change. A number of organizations, businesses, and local governments participated in public hearings, meetings, and workshops held by the District regarding the proposed revisions. One participant was CBIA, a statewide trade organization representing over 6,500 members involved in residential and light commercial construction, including homebuilders, architects, trade contractors, engineers, designers, and other industry professionals.

During the public hearing process, CBIA and other groups, including public agencies, expressed concern the proposed thresholds and guidelines were too stringent and would make it difficult to complete urban infill projects close to existing sources of air pollution. According to these groups, EIRs would be required for many projects where they otherwise would not have been, and other projects would not be approved. If these infill projects were not feasible, they argued, developers would build in more suburban areas, thus (paradoxically) causing even more pollution due to automobile commuter traffic.

On June 2, 2010, the District's Board of Directors passed Resolution No. 2010-06, adopting new thresholds of significance for air pollutants, including GHGs, TACs and $PM_{2.5}$ (the Thresholds). The District published new "CEQA Air Quality Guidelines" (District Guidelines), which were designed to "help lead agencies navigate through the CEQA process" and which describe "step-by-step procedures for a thorough environmental impact analysis of adverse air emissions due to land development in the Bay Area." The District's 2010 Guidelines include tables setting forth the new Thresholds and explaining they "represent the levels at which a project's individual emission of criteria air pollutants or precursors would result in a cumulatively considerable contribution to the [Bay Area]'s existing air quality conditions." They also suggest methods of assessing and mitigating impacts found to be significant.

4

The District Thresholds for GHGs were designed to help the Bay Area reach its regional target for reducing GHG levels by 1.6 million metric tons over 10 years and are intended to be consistent with existing California legislation. For land use developments, a project's operations generally will not be deemed to have a significant impact if the project complies with a qualified GHG Reduction Strategy consistent with A.B. 32 goals or produces annual emissions of less than 1,100 metric tons per year of carbon dioxide equivalent ($CO_2e$), or 4.6 metric tons of $CO_2e$/per service population (residents and employees)/per year.

The Thresholds set significance levels for TACs and $PM_{2.5}$ based on daily emissions from construction and operations. In addition to daily emissions, the Thresholds set significance levels for TACs and $PM_{2.5}$ based on "Risks and Hazards" to receptors (persons who would be living or working on the site of the proposed project or within the area). Under this measurement, significance will be found if the cumulative emissions from all TAC sources within 1,000 feet exposes receptors to an increased cancer risk greater than 100 in a million, or if the TACs from any single source within 1,000 feet exposes receptors to an increased cancer risk of greater than 10 in a million. Additionally, an incremental annual average increase of more than .3 microgram $PM_{2.5}$ from a single source or .8 microgram from all sources would be deemed cumulatively significant. At the level of general and specific plans, the TAC Thresholds set overlay "buffer" zones around existing and planned sources of TACs and within 500 feet of all freeways.

On November 29, 2010, CBIA filed a petition for writ of mandate challenging the Thresholds. (Code Civ. Proc., § 1085.) After the trial court granted the District's demurrers to causes of action alleging the Thresholds were preempted by state law and amounted to an invalid "underground regulation" (see *Bollay v. Office of Administrative Law* (2011) 193 Cal.App.4th 103, 106-107), the court conducted a hearing on the merits of the following claims: (1) the District should have conducted a CEQA review of the Thresholds before their promulgation because they constitute a "project" within the meaning of CEQA; (2) the TAC/$PM_{2.5}$ Risks and Hazards Thresholds were arbitrary and

5

capricious to the extent they required an evaluation (impermissible under CEQA) of the impacts the environment would have on a given project; (3) aspects of the Thresholds were not based on substantial evidence; and (4) the Thresholds failed the "rational basis" test because sufficient evidence did not exist for their approval.[6]

The trial court agreed the District should have conducted an environmental review under CEQA before issuing the Thresholds. In its statement of decision, it concluded the District's "promulgation of the Thresholds is a 'project' under CEQA and, as such, [the District] is obligated by CEQA to evaluate the potential impact on the environment consequent to the project." The court characterized the Thresholds as "a discretionary activity directly undertaken by a public agency which may cause a reasonably foreseeable indirect physical change in the environment" and found the evidence in the record sufficient to support CBIA's claim the Thresholds "might discourage infill development, encourage suburban development or change land use patterns. . . ." The court rejected the District's argument that, assuming the Thresholds were a project, they were exempt from CEQA review under the "commonsense exemption," which applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment. . . ." (See CEQA Guidelines, § 15061(b)(3); *Muzzy Ranch*, *supra*, 41 Cal.4th at pp. 385-386.) CBIA's remaining arguments were not addressed. Judgment was entered in favor of CBIA and a writ of mandate was issued directing the District to set aside its approval of the Thresholds. CBIA filed a motion seeking attorney fees under Code of Civil Procedure section 1021.5 and was awarded $422,293.75.

The District appeals the judgment and the award of fees.[7] It argues (1) the promulgation of the Thresholds was not a "project" under CEQA and did not require

---

[6] Although the hearing was not transcribed, the record on appeal shows the superior court considered the full administrative record pertaining to the promulgation of the 2010 Thresholds and District Guidelines, as well as briefs submitted by the parties.

[7] Separate notices of appeal were filed from the judgment and order awarding attorney fees. We have ordered the appeals consolidated.

6

prior environmental review; (2) assuming the Thresholds were a project, they were exempt from CEQA review under the commonsense exemption; (3) CBIA and its members had a pecuniary interest in the litigation that precludes a fee award under Code of Civil Procedure section 1021.5; and (4) the fee awarded was excessive because it did not take into account the claims on which CBIA did not prevail.

CBIA urges us to uphold the trial court's judgment and fee award and to additionally resolve in its favor the claims the trial court found unnecessary to address: (1) the TAC/PM$_{2.5}$ Thresholds are arbitrary and capricious because they require an analysis of existing pollution on a proposed project; (2) the Thresholds were not supported by substantial evidence; and (3) the District's approval of the Thresholds was arbitrary and capricious.[8]

DISCUSSION

## I. CEQA REVIEW OF THRESHOLDS OF SIGNIFICANCE

A. *Overview of Relevant CEQA Provisions*

" 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the

---

[8] Amicus curiae briefs have been filed on behalf of the District by the Sierra Club and Center for Biological Diversity, the South Coast Air Quality Management District and San Diego County Air Pollution Control District, and the League of California Cities and California State Association of Counties. The Center for Creative Land Recycling, Burbank Housing, Bay Planning Coalition, San Francisco Housing Action Coalition, First Community Housing, San Mateo County Economic Development Association, Nonprofit Housing Association of Northern California and Bridge Housing have filed an amicus curiae brief on behalf of CBIA. We have read and considered those briefs in addition to those filed by the parties to the appeal.

agency chose if significant environmental effects are involved.' ([CEQA Guidelines], § 15002)." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285-286 (*Tomlinson*).) CEQA is designed to compel government to make decisions with environmental consequences in mind. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393.)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. ([Pub. Res. Code], § 21065.) [¶] The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption ([Pub. Res. Code], § 21080) or a categorical exemption set forth in the regulations ([Pub. Res. Code], § 21084, subd. (a); [CEQA Guidelines], § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' ([Pub. Res. Code], § 21080, subd. (c); see [CEQA Guidelines], § 15070. . . .) Otherwise, the agency must proceed to the third step, which entails preparation of an [EIR] before approval of the project. ([Pub. Res. Code], §§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)[9]

_____

[9] A "negative declaration" is a "written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an [EIR]." (Pub. Res. Code, § 21064.) A "mitigated negative declaration" is "a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed

8

Under CEQA, an EIR shall be prepared for any project that "may have a significant effect on the environment." (Pub. Res. Code, §§ 21151, 21100, subd. (a), 21080, subd. (d), 21082.2, subd. (d).) "Because of this 'may have a significant effect' language and the EIR's place at the heart of the CEQA scheme, an EIR is required ' "whenever it can be *fairly argued* on the basis of substantial evidence that the project may have significant environmental impact," ' regardless of whether other substantial evidence supports the opposite conclusion." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110 (*Communities*).)

The determination of environmental significance "calls for a careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (CEQA Guidelines, § 15064(b).) Though "an ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting" (*ibid.*), section 15064.7 of the CEQA Guidelines encourages public agencies to develop and publish "thresholds of significance" for use in determining the significance of environmental effects. Such thresholds promote "consistency, efficiency, and predictability in deciding whether to prepare an EIR." (*Communities*, *supra*, 103 Cal.App.4th at p. 111.)

Although CEQA is designed to promote the adoption of project alternatives or mitigation measures when feasible, it does not mandate the disapproval of a project with significant environmental effects and does not require the agency to "select the alternative course most protective of the environmental status quo." (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 695.) "CEQA's only purpose is to guarantee that the public and the

negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Pub. Res. Code, § 21064.5.)

9

agencies of government will be *informed* of environmental impacts, that they will *consider* those impacts before acting, and that insofar as practically possible, *feasible* alternatives and mitigation measures will be adopted to lessen or avoid adverse environmental impacts." (*Ibid.*) When economic, social, or other conditions make such alternatives or mitigation measures infeasible, a project may be approved in spite of significant environmental damage if the agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage. (Pub. Res. Code, §§ 21002, 21002.1, subd. (c); CEQA Guidelines, § 15093.)

B. *The District's Promulgation of the Thresholds Did Not Require Prior CEQA Review*

1. *Introduction and Standard of Review*

The District argues the Thresholds were not a project subject to CEQA review and the superior court erred in so concluding. This is a question of law to be decided de novo based on undisputed evidence in the record on appeal. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382; *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412-1413 (*Plastic Pipe*); *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984.) We review the District's decision, not the trial court's, and accord no deference to the conclusions reached by the District or the trial court on the issue. (*Kaufman & Broad—South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470 (*Kaufman*), *Plastic Pipe*, at p. 1407.)

A "project" under CEQA means "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] (a) An activity undertaken by any public agency. . . . [¶] . . . [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Res. Code, § 21065; see also CEQA Guidelines, § 15378.) The adoption of a rule, regulation, or ordinance fitting this definition may be a project subject

10

to CEQA. (*California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist.* (2009) 178 Cal.App.4th 1225, 1240 (*Mojave Desert*).)

CBIA asserts the District's Thresholds may cause a reasonably foreseeable indirect change in the physical environment because the significance levels for TACs and $PM_{2.5}$ are more stringent than under previous thresholds and will require a more thorough environmental analysis (e.g., a full EIR when a mitigated negative declaration might have otherwise sufficed). According to CBIA, the Thresholds will discourage developers from building desirable urban infill projects close to public transportation by making the CEQA review process more burdensome and expensive, and will result in more housing being built in the suburbs, causing more commuter traffic and more traffic-related emissions. CBIA also argues the GHG Thresholds are, by the District's own admission, designed to promote infill and transit-oriented development because the levels "tend to reduce GHG and other air pollutants emissions overall, rather than discourage large developments for being accompanied by a large mass of GHG." Thus, argues CBIA, it is "reasonably foreseeable" the Thresholds will cause an "indirect change in the physical environment." (Pub. Res. Code, § 21065.)

For two reasons, we conclude that the Thresholds were not subject to CEQA review. First, the CEQA Guidelines establish the required procedure for enacting generally applicable thresholds of significance such as those at issue in this case, and a prior CEQA review of the thresholds is not a part of this procedure. Second, the environmental change posited by CBIA as the basis for requiring CEQA review is speculative and not reasonably foreseeable.

> 2. *CEQA Guidelines section 15064.7 Does Not Provide for Prior CEQA Review*

The District promulgated the 2010 Thresholds under section 15064.7 of the CEQA Guidelines, a regulation that has been judicially upheld as consistent with the CEQA statutes and reasonably necessary to effectuate their purpose. (*Communities*, *supra*, 103

11

Cal.App.4th at pp. 108-109, 111.)  CEQA Guidelines section 15064.7 provides, "(a) Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects.  A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect will normally be determined to be less than significant.

[¶] (b) Thresholds of significance to be adopted for general use as part of the lead agency's environmental review process must be adopted by ordinance, resolution, rule, or regulation, and developed through a public review process and be supported by substantial evidence.  [¶] (c) When adopting thresholds of significance, a lead agency may consider thresholds of significance previously adopted or recommended by other public agencies or recommended by experts, provided the decision of the lead agency to adopt such thresholds is supported by substantial evidence."

Section 15064.7(b) of the CEQA Guidelines provides that thresholds of significance must be formally adopted through a public review process and supported by substantial evidence if, as in this case, they are to be placed in general use.  It does not additionally require an EIR or other CEQA review as a prerequisite for promulgating a threshold.  The reason for this seems clear:  the preparation of an EIR or other CEQA document would largely duplicate the public review process and substantial evidence standard set forth in section 15064.7.

The case before us is illustrative.  The District drafted proposed revised thresholds of significance in 2009, utilizing the scientific and administrative expertise of its staff.  It then conducted public hearings, outreach, and workshops for more than a year.  The administrative record, which contains staff reports, scientific reports and protocols, analyses of the effect the proposed thresholds would have on various projects, letters from interested parties, responses by the District, transcripts of hearings, and records

12

from various workshops, is in excess of 7000 pages.  CBIA and other groups with similar concerns about the proposed thresholds and their effects participated in that process.  The District took the comments of such groups into consideration before adopting the 2010 Thresholds.

In addition to this process, CBIA would have had the District undertake a CEQA review of the Thresholds prior to their promulgation, which, if no exemption applied, would result in either a negative declaration, a mitigated negative declaration, or the preparation of an EIR.  (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)  The purpose of an EIR, the most rigorous of these three levels of review (and the level of review we assume here for purposes of discussion), "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list the ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project."  (Pub. Res. Code, § 21061.)  Accordingly, an EIR must include a detailed statement of "[a]ll significant effects on the environment of the proposed project," as well as a separate section setting forth significant effects that cannot be avoided, significant effects that would be irreversible, mitigation measures, alternatives to the project, and the growth-inducing impacts of the project.  (Pub. Res. Code, § 21100, subd. (b).)

Though an EIR on the impact of the proposed Thresholds would have resulted in a single report setting forth the information in the preceding paragraph, it is difficult to see how that information would have substantively differed from what the District considered during the public review process it undertook before promulgating the Thresholds.  Any party objecting to the substance of the Thresholds as unsupported by substantial evidence could file a writ of mandate challenging them on that basis, as CBIA has done.  (See Part II.B., below.)  Requiring an EIR in addition to the process already in place would result in a duplication of effort, at taxpayer expense and to little if any purpose.  (See *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 175

13

(*Plastic Bag Coalition*) ["Common sense . . . is an important consideration at all levels of CEQA review"].)

While the definition of a "project" under CEQA is broad (*Friends of the Sierra Railroad v. Tuolomne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653 (*Friends of the Sierra*)), it should not be stretched so far as to require CEQA review in addition to the public hearings and substantial evidence standard already required for the promulgation of thresholds of significance under CEQA Guidelines section 15064.7. An interpretation of a statute or regulation, even one that might flow from its literal language, should be rejected when it is contrary to the apparent intent of the statute or regulation or would result in absurd consequences. (See *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27; *In re J.W.* (2002) 29 Cal.4th 200, 210.)

3. *The Thresholds Are Not a "Project" Because the Environmental Effect Posited by CBIA is Too Speculative to be "Reasonably Foreseeable"*

Assuming CEQA Guidelines section 15064.7 did not define the entirety of the process to be used when enacting thresholds of significance, we would still reject CBIA's claims that the District's Thresholds were a "project" requiring prior CEQA review. In reaching this conclusion, we bear in mind that the "whole of an action" must be considered in determining whether a project exists. (CEQA Guidelines, § 15378(a); *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 638.)

Public Resources Code section 21065 establishes a two-prong test for defining what constitutes a project. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1379.) As relevant here, the first prong is satisfied when the challenged action is an "activity directly undertaken by any public agency" or "an activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Res. Code, § 21065, subds. (a) & (c); CEQA Guidelines, § 15378(a)(1), (3).) The second prong is satisfied when the project "may

14

cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Pub. Res. Code, § 21065; CEQA Guidelines, § 15378(a).)

As to the first prong, the promulgation of the Thresholds by resolution is akin to an ordinance and can be viewed as an activity undertaken directly by the District. (See *Plastic Bag Coalition*, *supra*, 52 Cal.4th at p. 171, fn. 7.) The Thresholds can also be viewed as a component of "[a]n activity that involves the issuance to a person of a . . . permit, license, certificate, or other entitlement for use by one or more public agencies" in the sense they may be utilized for CEQA review of projects built by private individuals for which permits or other approvals are required. (Pub. Res. Code, § 21065.) In any case, "CEQA generally applies 'to discretionary projects proposed to be *carried out or approved* by public agencies. . . .' " (*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181, 191, emphasis added.)

Taking the first view, that the promulgation of the Thresholds was an activity directly undertaken by the District, that activity did not effect any direct change in the environment and can amount to a "project" only if the Thresholds may cause "a reasonably foreseeable indirect physical change in the environment" under the second prong of the analysis. (Pub. Res. Code, § 21065; CEQA Guidelines, § 15378(a).) An "indirect physical change in the environment" is "a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project." (CEQA Guidelines, § 15064(d)(2).) "A change which is speculative or unlikely to occur is not reasonably foreseeable." (CEQA Guidelines, § 15064(d)(3).)[10]

_____

[10] This elucidation of the phrase "a reasonably foreseeable indirect physical change in the environment" is not contained in the CEQA Guideline defining a "project" (CEQA Guidelines, § 15378), but in a Guideline that relates to determining whether a project may have a significant effect and thus requires an EIR. (CEQA Guidelines, § 15064; see *Tomlinson*, *supra*, 54 Cal.4th at p. 286.) "[I]dentical language appearing in separate statutory provisions should receive the same interpretation when the statutes cover the same or analogous subject matter." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1269, fn. 6; see also *California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 403.)

15

CBIA's claim that the Thresholds will have a reasonably foreseeable effect on the environment is predicated on the assumption the Thresholds will make it more difficult for developers to build residential projects in urban areas, thus causing more housing to be built in suburban and currently rural areas. For the Thresholds to result in the displaced development predicted by CBIA, the following would have to occur: (1) a lead agency charged with approval of a project would have to apply the Thresholds to that project; (2) the agency would have to find the project's impacts exceeded the Thresholds; (3) the impacts would have to be deemed significant for purposes of triggering an EIR; (4) absent the Thresholds, a finding of significance would not have been made; (5) the agency would have to disapprove the project rather than adopting mitigation measures or filing a declaration of overriding concerns, or the developer would have to abandon the project in response to the agency's actions; (6) the developer would have to move the project elsewhere; (7) that "elsewhere" would have to be in a location outside the urban center where the project had been previously sited; (8) the newly-sited project would have to be approved following CEQA review by the lead agency in the new jurisdiction; (9) people who would otherwise have lived in the urban area would have to move to the newly sited project but continue to commute to the urban area; and (10) this sequence of events would have to be repeated with sufficient frequency for the increase in traffic attributable to this displaced development to change the physical environment. While such a scenario is *possible*, it is too attenuated and speculative to be *reasonably foreseeable*, and it does not require CEQA review prior to the promulgation of the Thresholds themselves.

We next consider the Thresholds as a component of CEQA review necessary for the approval of future projects. To trigger CEQA review, an agency's action must "be 'a *necessary* step in a chain of events which would culminate in physical impact on the environment.' " (*Kaufman*, *supra*, 9 Cal.App.4th at p. 473, italics added [establishment of community facilities district to fund acquisition of school sites was not a "project"].) A decision by a public agency that does not commit the agency to a particular course of action does not amount to the approval of a project. (*Ibid*.; see also *Citizens to Enforce*

*CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594, 1600-1601.) "CEQA review is premature if the agency action in question occurs too early in the planning process to allow meaningful analysis of potential impacts. Although environmental review must take place as early as is feasible, it must also be 'late enough to provide meaningful information for environmental assessment.' " (*Friends of the Sierra*, *supra*, 147 Cal.App.4th at pp. 654-655.)

Teasing out the extent to which undefined future projects *might* be built or abandoned as a result of the Thresholds, and the extent to which land development projects *might* be relocated to a more suburban location, would require a prescience we cannot reasonably demand of the District. No public agency other than the District is committed to using the Thresholds, and the District does not act as the lead agency for the type of residential and commercial projects CBIA alleges will be displaced. Moreover, the Thresholds are not conclusive even when they are used by another agency; they simply set the levels at which an environmental effect will *normally* be deemed significant or insignificant. (CEQA Guidelines, § 15064.7(a); see *Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 342; *Communities, supra*, 103 Cal.App.4th at pp. 111-113 [invalidating former version of CEQA Guidelines section 15064, subdivision (h), which effectively *directed* agency to find effect was not significant when project complies with applicable regulatory standard]; *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108-1109.) Thus, even the disapproval or abandonment of a project to which the Thresholds had been applied could not easily be ascertained to be the product of the Thresholds per se.

It is true that, during the public review process, several local governments and agencies with responsibility for land use planning expressed concern that the Thresholds would deter urban infill development by requiring more extensive environmental review of projects next to freeways or other transportation corridors. At oral argument, counsel for CBIA characterized these concerns as "unrebutted evidence" the Thresholds would result in displaced development, and suggested the District, which lacked any expertise in land use planning, impermissibly disregarded this evidence. We respectfully disagree

17

with this conclusion. Even if the application of the Thresholds would make certain infill projects more costly or difficult to complete, it does not follow that the urban sprawl projected by CBIA is reasonably foreseeable. Representatives of the agencies who were concerned about the Thresholds might have had the expertise necessary to say that certain infill projects would be more costly or even infeasible, but no actual evidence was presented to show that developers of housing in densely populated cities such as San Francisco or Oakland would move their projects to the suburban fringes or rural areas.

The Supreme Court's decision in *Muzzy Ranch*, *supra*, 41 Cal.4th 372, does not compel the conclusion that the Thresholds are a project. In that case, a land use commission, established to ensure the orderly expansion of airports and the promulgation of appropriate land use measures, adopted by resolution a plan that, among other things, restricted residential development around Travis Air Force Base to levels then currently permitted under the area's general plan and zoning regulations. (*Id*. at pp. 378-379.) The court concluded the resolution amounted to a project under CEQA because freezing housing densities in one area of a jurisdiction might have the effect of displacing development to other areas, with attendant environmental consequences. (*Id*. at pp. 382-383.) It then held the "commonsense exemption" to CEQA applied because the resolution simply incorporated the existing general plan and zoning laws, and there was no evidence of any effort to change those provisions. (*Id*. at pp. 388-389.)

The *Muzzy Ranch* decision supports the proposition that when it is reasonably foreseeable activity by a public agency will displace land development to another location, the displaced development may be considered an indirect physical change in the environment. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382.) It was reasonably foreseeable the resolution in *Muzzy Ranch* would displace development to another location within the jurisdiction, because it specifically capped the permissible housing density in the area at issue. (*Id*. at p. 383.) In the instant case, the District's Thresholds did not purport to limit housing density in any way, and, as already explained, the likelihood and extent of any displaced development was speculative at best.

18

We also find it significant that the resolution in *Muzzy Ranch* was the product of a study concerning the compatibility of land use in the area around an air force base with the operations of that base.  Such a determination would not necessarily focus on broader environmental concerns, making CEQA review necessary to ensure such concerns were considered by the agency.  Here, by contrast, the Thresholds were by their very nature designed to measure environmental impacts as part of the CEQA process.

Also distinguishable is the decision in *Plastic Pipe*, *supra*, 124 Cal.App.4th 1390.  In that case, the state Building Standards Commission ordered CEQA review of a proposed uniform code provision allowing builders to use cross-linked polyethylene (PEX) pipes.  (*Id*. at pp. 1398-1401.)  A writ proceeding was brought by a manufacturer of PEX pipe, in which it was alleged no CEQA review was required.  (*Id*. at p. 1401.)  The appellate court disagreed, because there was evidence PEX could have a deleterious effect on the environment.  (*Id*. at p. 1407.)  It rejected a claim by the manufacturer that the causal link between the regulation and environmental change was too remote because PEX was only one of many materials available, and there was no certainty it would be used in any particular work of construction.  (*Id*. at p. 1413.)  The court concluded the approval of PEX made its use and the damage that might result from its use reasonably foreseeable.  (*Id*. at p. 1413.)  This seems unremarkable because the approval of a particular building material will almost certainly result in its use on *some* project; the connection between the Thresholds and displaced residential development is far more tenuous.

Similarly, in *Mojave Desert*, *supra*, 178 Cal.App.4th 1225, the court considered the enactment of a local air district rule allowing stationary sources of pollution to offset their emissions of particulate matter by paving dirt roads (which would in turn reduce the particulate matter generated by traffic on dirt roads).  (*Id*. at pp. 1230-1236.)  The plaintiffs challenged the new rule allowing the offset, arguing that particulate matter from combustion and stationary sources is not equivalent to, and is in fact more damaging than, particulate matter caused by traffic on dirt roads.  (*Id*. at pp. 1234-1237.)  The air district acknowledged that its adoption of the offset rule was a "project" under CEQA,

but argued unsuccessfully it was exempt as an "action[] taken . . . to assure the maintenance, restoration, enhancement, or protection of the environment. . . ." (*Id*. at pp. 1231, 1244.)

The air district's concession in *Mojave Desert* that the offset rule was a "project" was not surprising. By allowing polluters to utilize paving offsets, the rule would clearly change the physical environment: more combustion-related particulate matter would be emitted; the act of paving roads would produce additional emissions; wildlife and plants would be affected by the paving; and new land development would be encouraged due to the improved access to certain areas. (*Mojave Desert*, *supra*, 178 Cal.App.4th at pp. 1235-1236.) The District's Thresholds do not authorize the same sort of specific and immediate change; in fact, the indirect change on which CBIA purports to rely would come from the abandonment or disapproval of a particular project, an event which, in the moment, would effect *no* change on the physical environment at all.

For all of these reasons, we conclude no CEQA review was required before the District promulgated the Thresholds. Because we agree with the District the Thresholds do not qualify as a project, we need not consider the District's alternative claim that the commonsense exemption to CEQA applies.

## II. VALIDITY OF THRESHOLDS

In its petition for writ of mandate, CBIA raised several challenges to the substance of the Thresholds that were not ruled upon by the trial court. It urges us to resolve these issues, notwithstanding its failure to pursue a cross-appeal, arguing that these claims supply an independent ground for affirming the trial court's judgment. (*Little v. Los Angeles County Assessment Appeals Bds.* (2007) 155 Cal.App.4th 915, 925, fn. 6.)

Our reversal of the trial court's judgment vacating the Thresholds and ordering CEQA review would require the court to address CBIA's other challenges to the Thresholds on remand. But, because an appellate court's role in a CEQA case is essentially the same as the trial court's (*Rialto Citizens*, *supra*, 208 Cal.App.4th at p. 923), it would serve no useful purpose to remand the case. (*Knight v. McMahon*

20

(1994) 26 Cal.App.4th 747, 754, disapproved of on other grounds in *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1023; see also *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1195.)  We consider the other issues raised by CBIA on their merits.

A.  *The TAC/PM$_{2.5}$ Risk and Hazard Receptor Thresholds*

The Risks and Hazards section of the Thresholds include significance levels for TACs and PM$_{2.5}$ caused by a "new source" (i.e., a project that emits those pollutants), as well as for "new receptors" (i.e., residents and workers who will be brought into the area as a result of a proposed project).  In other words, a CEQA analysis that applied the Thresholds would consider both the effect of the pollution the project will create and the effect of existing pollution on the project and its future occupants.  CBIA claims the TAC and PM$_{2.5}$ thresholds for new receptors (hereafter, "receptor thresholds") are invalid, because CEQA does not require analysis of the impacts that existing hazardous conditions will have on a new project's occupants.  It argues "[t]he purpose of CEQA is to protect the environment from proposed projects, not to protect proposed projects from the existing environment." (*Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468 (*Baird*).)  CBIA relies primarily on a quartet of cases concluding an EIR is not required for a proposed project based solely on the effect of the environment on people who will live and work at the site of the project.

In the first of these cases, *Baird*, *supra*, 32 Cal.App.4th 1464, a drug and alcohol treatment facility for adult patients submitted plans to construct a new facility to treat male adolescents.  Neighbors argued an EIR was required to analyze the project due to contamination of the building site by oil and other harmful substances.  (*Id*. at pp. 1466-1467.)  This court concluded the effect of preexisting pollution on the proposed facility and residents was "beyond the scope of CEQA and its requirement of an EIR," which was necessary only "if substantial evidence supports a fair argument that the project may have a significant effect on the environment." (*Id*. at p. 1468.)  The proposed facility had

21

no potential to cause an adverse change in the environment, and other statutes addressed the problem of building a new facility near existing hazardous waste.  (*Id*. at p. 1469).  "The courts are statutorily prohibited from interpreting CEQA 'in a manner which imposes procedural or substantive requirements beyond those explicitly stated in' CEQA or its implementing guidelines."  (*Ibid*.)

In *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889 (*Long Beach*), the court considered a challenge to an EIR concerning the construction of a new high school and concluded it was not defective for failing to address, in its cumulative impact section, the effect of traffic corridors and freeways on the health of future students and teachers.  (*Id*. at p. 905.)  Although the school district was required by statute to consider the health effects of freeways and traffic corridors within a specified radius of the project, the freeways and traffic corridors in *Long Beach* were outside this range.  (*Id*. at pp. 903-904.)  "While [Public Resources Code] section 21151.8 requires the lead agency acquiring or constructing a school to consider whether the site itself contains environmental hazards or materials, the overall purpose of the cumulative impacts section of an EIR is to consider the '*change in the environment*' that results from the incremental impact of the project when added to other closely related projects."  (*Id*. at p. 905.)

In *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604 (*SOCWA*), the operator of a sewage treatment plant filed a petition for writ of mandate seeking the preparation of an EIR for a proposed residential development that was to be situated near the plant, arguing odors, noise, and wastewater runoff would harm future residents.  (*Id*. at pp. 1609-1610.)  This apparent concern for the plant's future neighbors was the guise for a less altruistic agenda—to get the developers of the project to pay to cover the plant's aeration tanks to eliminate the odors and stave off nuisance lawsuits.  (*Id*. at p. 1610.)  The court concluded no EIR was required based on the environment's effect on the project, because that was a concern that did not fall

within the scope of CEQA.  (*Id*. at pp. 1612-1616.)  "The Legislature did not enact CEQA to protect people from the environment.  Other statutes, ordinances, and regulations fulfill that function."  (*Id*. at pp. 1617-1618.)

The court in *SOCWA* acknowledged that Appendix G to the CEQA Guidelines contains a sample checklist form suggested for use in preparing an initial CEQA study and contains a few questions dealing with the exposure of people to environmental hazards.  (E.g., "Would the project . . . [¶] . . .[¶] . . . [e]xpose people or structures to a significant risk of loss, injury or death involving wildlife fires. . .?")  It further acknowledged section 15126.2 of the CEQA Guidelines, which deals with the content of EIRs and states in part, " 'The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected.  For example, an EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. . . . Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas). . . .' "  (*SOCWA*, *supra*, 196 Cal.App.4th at p. 1616.)  The court in *SOCWA* concluded that to the extent the examples given in the CEQA Guidelines were not examples of environmental effects wrought by development, they were inconsistent with the statutory scheme and were not controlling.  (*Id*. at p. 1616.)  The court also suggested that CEQA Guidelines dealing with the content of an EIR after an EIR had been determined necessary address a different point than whether an EIR should be required in the first place.  (*Id*. at p. 1617.)

Finally, in *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455 (*Ballona*), the court concluded a revised EIR on a proposed mixed-use development project did not have to discuss the impact of a possible sea level rise on the project.  "[T]he purpose of an EIR is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project."  (*Id*. at

23

p. 473.)  Like the court in *SOCWA*, the court in *Ballona* found aspects of CEQA Guidelines section 15126.2 and Appendix G to be inconsistent with the CEQA statutory scheme.  (*Ballona*, at pp. 473-474.)

CBIA argues the receptor thresholds are invalid under *Baird*, *Long Beach*, *SOCWA* and *Ballona* because an EIR may be deemed necessary based solely on the effect of the existing environment on a proposed project and its occupants.  The District questions the reasoning of the case law on which CBIA relies and argues its receptor thresholds are valid because "[i]t makes no sense to require analysis of the health risks to residents if a freeway is built next to them, but not to require analysis of the exact same risks if new homes are built next to an existing freeway."  The District claims that disregarding the effect of the environment on people who will occupy a new development after it is completed is contrary to one of CEQA's stated purposes:  providing "a decent home and suitable living environment for every Californian."  (Pub. Res. Code, § 21001, subd. (d).)

In support of its position, the District notes certain CEQA statutes require consideration of the preexisting environment.  As examples, the District cites Public Resources Code section 21096, subdivision (b), which provides a negative declaration may not be adopted for a project adjacent to an airport unless the lead agency considers "whether the project will result in a safety hazard or noise problem for persons using the airport or for persons residing or working in the project area."  The District also cites Public Resources Code section 21151.8 (a provision that was noted, but not controlling, in *Long Beach, supra,* 176 Cal.App.4th at pages 903 to 904), which provides an EIR relating to the acquisition or construction of a school site cannot be certified unless the lead agency follows procedures for ascertaining whether the site contains hazardous substances or is within a set radius of a freeway or traffic corridor.  We also note that Public Resources Code section 21083, which authorizes the promulgation of the CEQA Guidelines, defines a "significant effect on the environment" to include situations in

24

which "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Pub. Res. Code, § 21083, subd. (c).) A new project located in an area that will expose its occupants to preexisting dangerous pollutants can be said to have substantial adverse effect on human beings.

Ultimately, we need not decide whether *Baird*, *Long Beach*, *SOCWA,* and *Ballona* were correctly decided or whether, as a general rule, an EIR may be required solely because the existing environment may adversely affect future occupants of a project. CBIA's challenge to the receptor thresholds as unauthorized by CEQA are analogous to a claim a statute or regulation is unconstitutional on its face. In determining whether the receptor thresholds may stand, we therefore consider whether they present a "total and fatal conflict" with the relevant CEQA provisions or will be unauthorized "in the vast majority of [their] applications." (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084; *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 90 & fn. 5.)

The receptor thresholds are not facially invalid because the case law cited by CBIA does not bar their application in all or even most cases. For example, even under CBIA's analysis, the receptor thresholds may be used to evaluate whether a proposed project would itself increase the TACs or $PM_{2.5}$ to a cumulatively considerable level, i.e., whether the amount of pollution the project would add to the environment would be significant. The receptor thresholds could also be used to determine the health risks to students and personnel when a school project is located within a specified radius of a traffic corridor or freeway, or other source of hazardous emissions (including TACs), as required by Public Resources Code section 21151.8, subdivisions (a)(1)(D), (a)(2)(A) and (a)(3)(B).) And, as counsel for the District suggested at oral argument, the receptor thresholds could be relevant in a number of ways when determining whether the project at issue is consistent with the area's general or specific plan. (CEQA Guidelines, § 15125(d).)

25

Because the receptor thresholds are not invalid on their face, it would be inappropriate to set them aside. The continuing vitality of *Baird* et al. is better reserved for a case in which the receptor thresholds have actually been applied to a project.

B. *The TAC Single-Source and Cumulative Thresholds Are Supported by Substantial Evidence*

The Thresholds define TAC levels as significant if (1) the cumulative emissions of all TAC sources within 1,000 feet increases the cancer risk by more than 100 in a million, or (2) any single source of TAC emissions within 1,000 feet increases the cancer risk by more than 10 in a million. CBIA complains these levels are arbitrary and unsupported by substantial evidence.

The risk levels CBIA challenges are based on a District regulation used to determine whether a single new source of TACs will cause an increased cancer risk of greater than 10 in a million, a level that comports with that used by the United States Environmental Protection Agency, other air districts, and the California Air Pollution Control Officers Association. CBIA suggests this rule is arbitrary in light of the Threshold for cumulative TAC sources, which reach a level of significance only if the levels from *all* sources increase the risk by 100 in a million.

CBIA had the burden of establishing there was no substantial evidence to support the District's determination the receptor levels were appropriate. (See *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335-336.) For CEQA purposes, "substantial evidence" means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . [¶] [and] shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (CEQA Guidelines, § 15384.) A reviewing court "may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and

26

decision.' " (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596.)

During the public review of the Thresholds, the District offered the following explanation for the two different levels of cancer risk: "For new sources, the multi-source, cumulative threshold is designed to ensure that individual small sources don't cumulatively create a significant risk to receptors in the area. It can be argued that the single-source, individual threshold does this already. But, especially because many existing sources are not subject to a single-source threshold, District staff contends that the single-source threshold is not sufficient. That is, in an environment with many existing sources, even a small addition to the risk of a receptor can become significant. [¶] District staff is recommending that a multi-source threshold also apply to receptors in order to ensure that receptors are not moving into an area with many, collectively significant, sources. The reasoning for this threshold for receptors is similar to that for sources: to ensure that multiple small sources [do] not create a cumulatively significant impact. [¶] Recommending a cumulative threshold for a receptor that is higher that the corresponding individual threshold does raise the question, 'why should a receptor care if there is one big source or multiple small sources?' The answer, at least in part, is that different sources can emit different pollutants, cause harm to different organs, cause different types [of] health effects, and lead to different types of cancer. Thus, a single source posing a cancer risk of 90 in a million could be different (medically speaking) than multiple sources that add to the same risk."

Additionally, in a report on the proposed Thresholds issued May 3, 2010, the District offered the following explanation as justification for the Thresholds challenged by CBIA: "Emissions from a new source or emissions affecting a new receptor would be considered significant where ground-level concentrations of carcinogenic TACs from any source result in an increased cancer risk greater than 10.0 in one million, assuming a 70 year lifetime exposure. . . . [¶] The 10.0 in one million cancer risk threshold for a

27

single source is supported by EPA's guidance for conducting air toxics analyses and making risk management decisions at the facility and community-scale level. It is also the level set by the Project Risk Requirement in the Air District's Regulation 2, Rule 5 new and modified stationary sources of TAC, which states that the Air Pollution Control Officer shall deny an Authority to Construct or Permit to Operate for any new or modified source of TACs if the project risk exceeds a cancer risk of 10.0 in one million. [¶] This threshold for an individual new source is designed to ensure that the source does not contribute a cumulatively significant impact. . . . [¶] The single-source threshold for receptors is provided to address the possibility that within the area defined by the 1,000 foot radius there can be variations in risk levels that may be significant, below the corresponding cumulative threshold. Single-source thresholds assist in the identification of significant risks, hazards, or concentrations in a subarea, within the 1,000 foot radius."

CBIA has not carried its burden of establishing the levels for cumulative and single-source TAC emissions were arbitrary or unsupported by substantial evidence.

C. *The District's Approval of the Thresholds Was Not Arbitrary and Capricious*

CBIA argues in a conclusory fashion there is no "rational connection between any evidence and the choices made in developing the Thresholds" and suggests the District did not follow the correct administrative procedure for their promulgation. Because this contention is not supported by appropriate argument and citations, we consider it no further. (*Daily v. Sears, Roebuck and Co.* (2013) 214 Cal.App.4th 974, 994, fn. 7.) In any event, the claim is untenable given the extensive information considered by the District in formulating the Thresholds and the lengthy public review process preceding their adoption.

III. ATTORNEY FEES

The trial court awarded CBIA attorney fees under Code of Civil Procedure section 1021.5, under which fees are available "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right

28

affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one pubic entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Because we have reversed the judgment in CBIA's favor and have declined to grant the relief it sought on the issues not resolved by the trial court, CBIA is no longer a successful party in the litigation and the order awarding fees must be reversed. (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 371; see also *Ebbets Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376, 381-388 [discussing meaning of "successful party" under Code Civ. Proc., § 1021.5].)

## DISPOSITION

The judgment is reversed. The superior court shall vacate its writ of mandate and its order awarding CBIA attorney fees under Code of Civil Procedure section 1021.5. The District (appellant) is entitled to recover its ordinary costs on appeal.[11]

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.

_____

[11] The request for judicial notice filed by amicus curiae South Coast Air Quality Management District and San Diego County Air Pollution Control District on March 4, 2013 is denied, as is the request for judicial notice filed by respondent CBIA on March 22, 2013. Both requests seek judicial notice of materials outside the administrative record considered by the District and the trial court. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573.) Additionally, those materials pertain to the actions of other agencies and are not relevant to the resolution of this case.

Trial court: Alameda County Superior Court

Trial judge: Hon. Frank Roesch


Cox, Castle & Nicholson, Michael H. Zischke, Andrew B. Sabey and Christian H. Cebrian for Plaintiff and Respondent.

Brian C. Bunger, Randi L. Wallach; Shute, Mihaly & Weinberger, Ellison Folk and Erin B. Chalmers for Defendant and Appellant.


Perkins Coie, Stephen L. Kostka and Geoffrey L. Robinson for Center for Creative Land Recycling, Burbank Housing, Bay Planning Coalition, San Francisco Housing Action Coalition, First Community Housing, San Mateo County Economic Development Association, Nonprofit Housing Association of Northern California and Bridge Housing as Amici Curiae on behalf of Plaintiff and Respondent.

Matthew Vespa for Sierra Club and Center for Biological Diversity as Amicus Curiae on behalf of Defendant and Appellant.

Burke, Williams & Sorensen, Thomas B. Brown and Matthew D. Visick for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Kurt R. Wiese, General Barbara B. Baird, District Counsel, Veera Tyagi and Ruby Fernandez, Sr. Deputies District Counsel for the South Coast Air Quality Management District; Thomas E. Montgomery, County Counsel and Paula Forbis, Sr. Deputy County

Counsel for San Diego County Air Pollution Control District Counties as Amici Curiae on behalf of Defendant and Appellant.